**Richmond**

BOYD DePRIEST

v.

COMMONWEALTH OF VIRGINIA

No. 0005-86

Decided August 4, 1987

COUNSEL

John H. Herbig (Parker, Pollard & Brown, P.C., on briefs), for appellant.

Leah A. Darron, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**KEENAN, J.** — Boyd DePriest was convicted in a jury trial of possession of heroin in violation of Code § 18.2-248. He was sentenced in accordance with the jury's verdict to seven years incarceration. On appeal, DePriest argues that the heroin found in his possession should have been suppressed as the product of an illegal search. We affirm the judgment of conviction, finding that the search of DePriest, which revealed heroin, was a lawful search incident to his arrest.

I.

The events giving rise to this case took place during the late evening of July 25 and early morning of July 26, 1985. Detective D.R. Carter, an eleven year veteran of the Richmond Bureau of

Police, Narcotics Division, testified that he was conducting a surveillance in the vicinity of Second and Clay Streets in Richmond when he observed DePriest and Michael Toney arrive together at 9:30 p.m. Shortly thereafter, Carter observed Toney receive money from a female and saw Toney and DePriest leave the scene for five or six minutes. When they returned, Toney handed something to the female. Carter could not identify what was exchanged.

At 10:20 p.m. Carter observed Toney receive money from a male. According to Carter, Toney and DePriest again left for five minutes and when they returned, Toney handed an item to the man. Carter could not identify the item.

At 10:45 p.m. Carter observed the arrival of a man known to him as James Hopkins. Carter testified that he knew Hopkins because he had arrested him in 1978 and 1985 for "heroin, preludin." Carter saw Toney approach Hopkins and observed that "there was hand contact between the two." Carter could not see what, if anything, was exchanged. After the hand contact, Toney "disappeared into a one-story garage." Hopkins then approached DePriest and handed him money. According to Carter, DePriest counted the money and put it in his pocket. Hopkins left the area and shortly thereafter Toney returned and handed money to DePriest. Carter observed DePriest sit down on the curb and count the money before placing it in his pocket.

At 11:10 p.m. Carter observed hand contact between DePriest and Toney at a Coke machine near the Golden Comb Beauty Shop. Toney then went into an alley and returned within three minutes. He and DePriest approached a female who was handed "some item" by Toney. At 11:15 p.m. Carter observed DePriest talking with a different female. Carter testified that DePriest "signaled" to Toney, who in turn signaled the female to whom Toney had previously handed an item. All four of these people then went to the Coke machine where Carter observed one of the females hand money to DePriest. Carter also observed "hand contact" between the female and DePriest after she handed him money. DePriest then went into the alley and returned three minutes later. At this point, Carter observed further "hand contact" between DePriest and Toney, after which both men went back into the alley.

At 11:31 p.m. DePriest and Toney came out of the alley. Carter observed Toney approach a male and hand something to him. The man examined the item and put it in his pocket. Toney then went into the home of "a guy named Majors," who Carter described as "an old man that uses drugs and alcohol." Toney returned to the alley and came out with a small brown paper bag.

At 12:30 a.m. Carter observed DePriest and Toney go to an apartment located over the Golden Comb. Carter testified that he could see them in the apartment, but could not tell what they were doing. He testified that he also saw three females in the apartment. Within three minutes, the females came out of the apartment and walked past Carter's surveillance point. Carter testified that one of the females "had in her hand a plastic bag which she was looking at, and it had [a] white powdery substance."

When DePriest and Toney exited the apartment, Carter directed other officers to follow them to a location where they could be detained and searched. Specifically, Carter testified: "I directed the officers to detain them based on my observations and I would respond and I also directed the officers to search both individuals."

Pursuant to Carter's request, DePriest and Toney were stopped on Sixth Street by Detectives Evans, Jackson and Cox. Evans testified that he conducted a pat down search of DePriest for weapons while Jackson conducted a similar pat down of Toney. Nothing was found on either man at this point.

Carter arrived within a few minutes and conducted a further search of Toney. He testified: "I searched Michael Toney's pockets. I retrieved one plastic bag from Mr. Toney's pocket which contained the white powder. Mr. Toney and Mr. DePriest were then arrested and charged with possession of heroin with intent to distribute." Carter acknowledged that if he had not found any drugs on Toney he would not have arrested DePriest.

Carter further testified that after DePriest was arrested, he conducted another pat down search for weapons and found nothing other than some money. He confirmed that no controlled substances were found on DePriest at this time. According to Carter, his arrest of DePriest was "based upon my observations of Mr. Toney and Mr. DePriest for the three and a half hour period, and

then based upon the contraband found on Mr. Toney and based upon the currency that I had observed Mr. Toney give Mr. DePriest after what I suspected to be drug transactions, and based on my experience."

Following his arrest, DePriest was taken to the office of the Narcotics Division where he was searched by Detective Gary Clarke. The search revealed that DePriest had in his underwear a plastic bag containing six smaller plastic bags. The smaller bags contained a white powder. Examination of the powder established that it consisted of 1.025 grams of heroin.

DePriest filed a pre-trial motion to suppress the heroin found on his person. He argued that his arrest was unlawful because the only basis for his arrest was the fact that Toney was found in possession of one package of suspected heroin. A suppression hearing was held at which DePriest, Carter, and Clark testified. After hearing the evidence and arguments of counsel, the court ruled that the arrest of DePriest was "appropriate" and denied the motion to suppress.

On appeal, DePriest renews his argument that the search which revealed heroin on his person was undertaken pursuant to an illegal arrest. He argues in this regard that Carter's observations led to nothing beyond an unparticularized suspicion, which under Article I, Section 10 of the Constitution of Virginia, is insufficient to establish probable cause. DePriest concedes that Carter possessed sufficient grounds to justify a brief detention pursuant to the authority of *Terry v. Ohio*, 392 U.S. 1 (1968). He argues, however, that once the first pat down search revealed no weapons or incriminating evidence, there was no further justification to hold him. Accordingly, he argues that he was illegally detained at the time Carter found incriminating evidence in Toney's pocket. Finally, DePriest argues that the Commonwealth is bound by the testimony elicited at the suppression hearing and may not rely, as it has done on brief, on evidence presented at trial.

The Commonwealth argues that Carter's observations over a three and a half hour period, combined with his experience as a narcotics detective, gave him probable cause to arrest DePriest and Toney at the time he initially ordered that they be stopped. Further, the Commonwealth argues that even if Carter did not have probable cause to arrest, he at least had reasonable suspicion

to detain DePriest and Toney and that once suspected heroin was found in Toney's possession, Carter had probable cause to arrest DePriest. The Commonwealth concedes that the search of Toney's pocket may have exceeded the scope of a *Terry* stop, but it argues that DePriest lacks standing to challenge the search of Toney. It, therefore, argues that the fruits of this search may be used against DePriest even if they were improperly seized from Toney.

## II.

■ Initially, we reject DePriest's argument that the Commonwealth may not rely on any testimony which was presented at trial, but not presented at the suppression hearing. A similar argument was made in *Carroll v. United States*, 267 U.S. 132 (1925). There, the Supreme Court stated:

> If the evidence given on the trial was sufficient, as we think it was, to sustain the introduction of the [evidence], it is immaterial that there was an inadequacy of evidence when application was made for its return. A conviction on adequate and admissible evidence should not be set aside on such a ground. The whole matter was gone into at the trial, so no right of the defendants was infringed.

*Id.* at 162. Accordingly, we will look to the entire record in determining whether the heroin found on DePriest was lawfully seized. Further, the burden is on DePriest to show that the trial court's denial of his suppression motion constituted reversible error. *Fore v. Commonwealth*, 220 Va. 1007, 1010, 265 S.E.2d 729, 731, *cert. denied*, 449 U.S. 1017 (1980).

■ The validity of the seizure of heroin from DePriest at the police station depends upon the validity of his arrest. If DePriest was properly arrested, it follows that the subsequent full body search which revealed heroin was a lawful search incident to arrest. *Illinois v. Lafayette*, 462 U.S. 640, 646 (1983). DePriest does not contest this conclusion. Instead, he argues that for the reasons stated above, he was illegally arrested. The validity of the arrest depends upon whether Detective Carter had probable cause to believe that an offense had been committed. Code § 19.2-81. The Supreme Court of Virginia has stated: "[T]he test of constitutional validity is whether at the moment of arrest the arresting

officer had knowledge of sufficient facts and circumstances to warrant a reasonable man in believing that an offense has been committed." *Bryson v. Commonwealth*, 211 Va. 85, 86-87, 175 S.E.2d 248, 250 (1970).

The Supreme Court of Virginia has further stated: "[I]n assessing an officer's probable cause for making a warrantless arrest, no less strict standards may be applied than are applicable to a magistrate's determination that an arrest warrant should issue." *Washington v. Commonwealth*, 219 Va. 857, 862, 252 S.E.2d 326, 329 (1979). Regarding the proper standard for assessing probable cause, the Court stated in *Washington*:

"As an articulated legal standard, probable cause deals with probabilities concerning the factual and practical considerations in everyday life as perceived by reasonable and prudent persons. It is not predicated upon a clinical analysis applied by legal technicians. In determining whether probable cause exists courts will test what the totality of the circumstances meant to police officers trained in analyzing the observed conduct for purposes of crime control."

*Id.* at 862, 252 S.E.2d at 329 (quoting *Hollis v. Commonwealth*, 216 Va. 874, 876-77, 223 S.E.2d 887, 889 (1976)) (citations omitted).

Reviewing the totality of the circumstances here, we do not agree with the Commonwealth that Carter's observations and experience alone established probable cause to arrest DePriest prior to the time suspected heroin was found on DePriest's companion, Michael Toney. The Commonwealth relies on three cases from the United States Court of Appeals for the District of Columbia: *United States v. Lucas*, 778 F.2d 885 (D.C. Cir. 1985); *United States v. Green*, 670 F.2d 1148 (D.C. Cir. 1981); and *United States v. Davis*, 561 F.2d 1014 (D.C. Cir.), *cert. denied*, 434 U.S. 929 (1977). In each of these cases, however, the court relied on more than an experienced officer's observation of suspicious activity in determining that probable cause existed to make an arrest.[1]

---

[1] In *Davis*, a case involving possession of preludin, there was evidence that the area under surveillance was well known as a place where narcotics transactions frequently occurred. Further, the arresting officer testified that he had previously made nine preludin related arrests in that area. Finally, during his observations the arresting officer actually

The court in *Green* specifically stated that "a sequence of events which is typical of a common form of narcotics transaction may create a suspicion in a police officer's mind, but probable cause, of course, requires more than mere suspicion." 670 F.2d at 1151.

In the present case, we believe that the events witnessed by Detective Carter during his surveillance provided him with a suspicion of criminal activity, but not probable cause. It is relevant in this regard that Carter did not observe suspected narcotics change hands, nor did he observe the exchange of any object which in his experience suggested narcotics. *See People v. McRay*, 51 N.Y.2d 594, 601, 416 N.E.2d 1015, 1018 (1980).[2] Further, there was no evidence that the area under surveillance was noted for heroin transactions, or that the transactions observed were furtive in nature. In summary, while the events observed by Detective Carter were suspicious they did not, alone, establish probable cause.

It does not follow, however, that the ultimate arrest of DePriest was illegal. Even though Carter's observations did not alone establish probable cause, they did, as DePriest concedes, establish reasonable suspicion. In *Terry v. Ohio*, the United States Supreme Court held that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22. The Court has further elaborated: "[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly, while attempting to obtain additional information." *Hayes v. Florida*, 470 U.S. 811, 816 (1985); *see Williams v. Commonwealth*, 4 Va. App. 53, 64, 354 S.E.2d 79, 85 (1987).

---

saw what appeared to him to be preludin tablets. 561 F.2d at 1016-17. In *Green*, the court relied on the arresting officer's observations of furtive transactions in an area "notorious for the frequency of narcotic sales," along with the defendant's attempt to flee and dispose of a brown paper bag when approached by the police. 670 F.2d at 1152-53. In *Lucas*, a telephone tip alerted police that two women, later seen engaging in a furtive transaction with the defendant, were selling valium. In addition, the court noted that this transaction took place near a methadone and detoxification center and that the arresting officer "knew of previous arrests for the sale of valium in the area." 778 F.2d at 988.

[2] We note that although Carter observed a female leaving the Golden Comb carrying a plastic bag which contained a white powder, there was no evidence that she obtained this bag from DePriest or Toney.

In the present case, Carter's observations led him to request that other officers detain DePriest and Toney until he could arrive to investigate his reasonable suspicion that the two men were selling narcotics. This action was entirely appropriate under the authority of *Terry*. DePriest argues, however, that the ensuing detention exceeded the scope of a *Terry* stop, thus becoming an "arrest" and requiring probable cause for its justification. On the facts presented here, we disagree.

■ The Supreme Court has made it clear that even when an initial detention is justified as a *Terry* stop "at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments." *Hayes*, 470 U.S. at 815-16; *see Florida v. Royer*, 460 U.S. 491 (1983); *Dunaway v. New York*, 442 U.S. 200 (1979).

■ Determining exactly when an investigatory detention becomes an arrest may "create difficult line-drawing problems." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). The Supreme Court has acknowledged that there is no "litmus-paper test for distinguishing . . . when a seizure exceeds the bounds of an investigative stop," and that variations in the facts of each case make it "unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment." *Royer*, 460 U.S. at 506-07. The Court therefore has concluded: "Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Sharpe*, 470 U.S. at 685.

The facts of the present case do not establish that DePriest and Toney were under arrest as of the time Carter first ordered their detention. Very little evidence was elicited regarding the circumstances of this detention. However, the testimony of Detective Evans established that when DePriest and Toney were stopped, they were patted down for weapons but not subjected to further investigation until Carter arrived.[3] Evans' testimony in this regard was not contradicted by either DePriest, who testified at the sup-

---

[3] On cross-examination, Evans testified as follows:

pression hearing, or by Toney who testified at trial.

■ Further, it is clear that Evans' detention of DePriest and Toney pending the arrival of Carter did not, in itself, transform the stop into an arrest. This is true despite the fact that the pat down searches of both men failed to reveal any weapons. In *Sharpe*, the Court recognized that it may be appropriate in some circumstances for one officer to detain a suspect pending the arrival of another officer who possesses greater knowledge of the suspect's activity. 470 U.S. at 687 n.5.

■ In addition, there is no suggestion from the present record that the length of the detention was of such duration that the stop was no longer justified under the authority of *Terry*. The test in such circumstances is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686. DePriest does not request, and the facts do not support, a finding that the police in this case failed to act quickly to confirm or dispel their suspicions.

DePriest's argument that the initial stop constituted an arrest relies heavily on Carter's testimony that he ordered the other officers to detain and "search" DePriest and Toney. Throughout his argument, DePriest assumes that Carter's use of the term "search" necessarily implies that an arrest took place. Our determination of the issue, however, turns upon the facts presented, and not upon particular terms of art used by a witness to describe the facts. Evans' uncontradicted testimony was that the "search" carried out pursuant to Carter's request was nothing more than a permissible pat down for weapons.

The Commonwealth argues that DePriest was not actually arrested until Carter arrived on the scene and found a substance he suspected was heroin in the pocket of Michael Toney. It further argues that the discovery of this substance, along with Carter's

Q. You testified that you searched Michael Toney?
A. No, I patted him down for weapons.
Q. Who searched Michael Toney? Detective Carter?
A. Yes, he did.
Q. And, you also searched the defendant, Boyd DePriest?
A. I patted Boyd DePriest down for weapons.

prior observations, provided him with probable cause to arrest DePriest. Our review of the record confirms this conclusion. Detective Carter testified that when he arrived at the location where DePriest and Toney were being detained, he conducted a search of Toney's pockets and found a plastic bag containing white powder. According to Carter, it was at this point that he placed DePriest and Toney under arrest. Clearly, the discovery of the plastic bag provided Carter with probable cause to arrest DePriest when viewed along with his prior observations of DePriest's activities.

We note that the record is ambiguous as to whether the "search" of Toney's pockets exceeded the limits of a *Terry* stop. If Carter reached into Toney's pocket in search of evidence, his action was not "the least intrusive means reasonably available to verify or dispel" his suspicions, and the search was illegal. *Royer*, 460 U.S. at 500. Although the record in this regard was not developed by counsel, the Commonwealth concedes on brief that "it appears . . . the search of Toney's person went beyond the scope authorized by *Terry*." However, even assuming that Toney was illegally searched, DePriest lacks standing to object to the search.

"In order to obtain protection against unreasonable searches and seizures, appellant bears the burden of proving that he has standing to assert the constitutional right." *McCoy v. Commonwealth*, 2 Va. App. 309, 311, 343 S.E.2d 383, 384 (1986); *see United States v. Givens*, 733 F.2d 339, 341 (4th Cir. 1984).

In *Givens*, the court summarized the relevant principles as follows:

> It is firmly established that Fourth Amendment rights are personal and may not be vicariously asserted, and that the exclusionary rule's benefits run only to those whose Fourth Amendment rights have been violated. To claim the protection of the Fourth Amendment, a defendant must have "a legitimate expectation of privacy in the invaded place."

733 F.2d at 341 (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)) (citations omitted).

In order to object to the search of Toney, DePriest must show that he had a legitimate expectation of privacy in Toney's pocket.

We find nothing in the record to support such a conclusion, and existing case law does not support DePriest's position. *See Rawlings v. Kentucky*, 448 U.S. 98 (1980). For example, in *United States v. Brown*, 743 F.2d 1505 (11th Cir. 1984), the court considered a factual situation similar to that presented here. Cocaine was illegally seized from the person of Brown's companion, Manikowski. The court refused to disallow use of the evidence against Brown, finding that he had no legitimate expectation of privacy in Manikowski's person. It noted that Brown could not "acquire a right to exclude others from access to a third person," 743 F.2d at 1507, and further stated:

> Brown cannot reasonably expect to control Manikowski, whom he talks to, or who talks to him. Because Brown could not assert control over Manikowski and could not exclude access to Manikowski, he cannot assert a legitimate privacy interest in contraband hidden on Manikowski's person.

*Id.* at 1508; *see also United States v. Kuespert*, 773 F.2d 1066, 1068-69 (9th Cir. 1985).

We find that DePriest did not have a legitimate expectation of privacy in Toney's person and thus lacks standing to contest the arguably illegal search of Toney conducted by Detective Carter. We hold, therefore, that DePriest's arrest was based on probable cause and that the subsequent search of him at the police station revealing heroin concealed in his underwear was a lawful search incident to arrest. DePriest's conviction for possession of heroin is affirmed.

*Affirmed.*

Benton, J., and Cole, J., concurred.