## Richmond
DWIGHT OLEF WELLS

v.

COMMONWEALTH OF VIRGINIA

No. 1029-86-2

Decided July 5, 1988

COUNSEL

R. Wayne Dawson, for appellant.

Robert B. Condon, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**COLE, J.** — The appellant, Dwight Olef Wells, was convicted in a jury trial of four robberies and four charges of use of a firearm in the commission of the robberies. On appeal, he contends that the trial court erred in denying his motion to suppress certain items seized in an allegedly illegal search of his automobile.

I.

On December 28, 1985, at approximately 6:15 p.m., Debbie Watson, an employee of the Piece Goods Shop, a business located at 9051 Broad Street in Henrico County, was robbed. She described the robber as a black male using a handgun and wearing a ski mask, a navy blue jacket, jeans and white sneakers. About nine minutes later, an employee of the Hair Cuttery, another business establishment located at 8906 Broad Street in Henrico County, was robbed. She described the robber as a black male using a handgun. Felicia Anderson, another Hair Cuttery employee, was in the parking lot behind the business when she saw a black male run past her heading toward the Golden Skillet Restaurant located at 8701 Broad Street. At about 6:30 p.m., the employees of Golden Skillet Restaurant were robbed. They described the robber as a black male using a handgun and wearing a ski

mask, dark jacket, jeans and white tennis shoes.

Patrolman R. J. Smith, Sr., a ten year veteran of the Henrico County police department, was on routine patrol in the immediate area. At 6:16 p.m., he received a radio call reporting that the Piece Goods Shop had been robbed. Although not assigned to the case, Smith proceeded to the area of the Piece Goods Shop and while en route, at 6:25 p.m., he received a report of the Hair Cuttery armed robbery. At this point in time, Smith knew from the radio reports that the suspect was a black male who had used a mask and a handgun in the robberies, but no report was received concerning use of a motor vehicle. Believing that the robber might be heading west toward another shopping center on Broad Street, Smith continued to patrol to the west on Broad Street, the major thoroughfare in the area. Not seeing anything suspicious, he turned back and proceeded east on Broad Street.

At 6:35 p.m., when he was approximately twenty seconds from the Golden Skillet Restaurant, Smith received a radio dispatch telling of the armed robbery there. The Golden Skillet Restaurant is located at the southwest corner of Skipwith Road and Broad Street. A Shoney's Restaurant is located at the southeast corner of that intersection. Smith, driving east on Broad Street, proceeded past the Golden Skillet Restaurant and Skipwith Road when a vehicle suddenly pulled out of the Shoney's restaurant parking lot, in front of his vehicle. Smith had to brake abruptly to avoid a collision.

The driver of the vehicle, a black male, stared at Officer Smith and then crossed over three lanes of traffic to the inside lane nearest the median strip and proceeded east. Smith followed. At the next intersection, three tenths of a mile east, the vehicle pulled into the left turn lane. Smith, in the center lane, pulled adjacent to the vehicle and looked at the driver. Smith noticed the driver "jerk his head in his [Smith's] direction three times." When Officer Smith stretched his head in order to observe the driver's license number, "the driver slumped down in the seat to where his head was pretty well even with the steering wheel."

When the advance left turn light came on, the driver turned left, maintaining the "slumped down" position. Smith notified radio communication that he was following a suspicious black male driving a dark green Pinto. Smith activated his red lights to clear

the traffic at the intersection and proceeded after the vehicle. He caught up with it four-tenths of a mile away. Officer Smith then reactivated his red lights and used his siren to signal the driver to stop. The vehicle moved from the right lane to the left lane and continued without stopping at about forty-five miles per hour. Smith radioed for a back-up vehicle, advising that the vehicle did not stop. Approaching an intersection, the vehicle turned left and began accelerating rapidly. The driver passed a driveway into a public high school, but turned right into another driveway marked "Do Not Enter" and "One Way," and came to an abrupt stop. Smith pulled up next to the vehicle. The driver, later identified by Smith to be the defendant, Dwight Olef Wells, hurriedly exited the vehicle. He was wearing jeans and white tennis shoes and approached Smith's vehicle at a quick jog. Smith got out of his vehicle, drew his gun, and ordered Wells to stop. Wells stated, "I didn't do it." Smith got him to the rear of his (Wells') vehicle and commenced frisking him for weapons.

Officer Smith did not complete his *Terry* frisk of Wells for weapons because as he was "patting-down" Wells' legs, Wells ran and escaped the scene on foot. Smith then went to Wells' vehicle to ascertain whether any other person might still be present. Without entering the vehicle, he shined his flashlight into the interior where he observed money thrown about the right front passenger seat along with a check payable to Piece Goods Shop dated that day, a bag, a dark jacket and a revolver. Smith did not enter the vehicle.

After the inspection of Wells' vehicle, Smith pursued Wells on foot. Sgt. J. W. Pearce, responding to radio communications, came upon the scene and found two abandoned vehicles, including Smith's vehicle. Not knowing where Officer Smith was, he checked both vehicles. With his flashlight, he looked into the interior of Wells' car and saw the same items that Smith had seen, including the handgun located on the floor on the passenger side of the vehicle. He opened the door, looked at the gun, observed that it was a toy, but did not further enter the vehicle.

While the police were still at the scene, Wells returned in another vehicle driven by his girlfriend. He claimed ownership of the green Ford Pinto. His statement to the officers was that earlier he had been knocked out by an attacker who then stole his car; when he woke up, he was in the woods in the area and he went to a

nearby home to call the police. Officer Smith was recalled to the scene. He identified Wells as the driver of the vehicle he had stopped earlier, and Wells was placed under arrest for the three robberies.

Wells' vehicle was confiscated and towed to a police impound lot. A search warrant was later obtained and executed, disclosing $1,151.50 in currency, four checks made payable to the Piece Goods Shop dated December 28, 1986, a ski mask, a dark navy blue jacket, a pair of gloves and a fake handgun.

At trial, in addition to Officer Smith's positive identification of Wells as the operator of the vehicle, an expert testified that fingerprints taken from the back of the car where Wells was positioned to be frisked conclusively matched Wells' known prints. Employees of the stores where the robberies occurred also identified Wells as the robber.

## II.

Wells filed a motion to suppress all of the evidence that was seized as a result of the search of his vehicle pursuant to the search warrant, maintaining that the search was illegal and violated his rights against unreasonable searches and seizures guaranteed under the fourth and fourteenth amendments of the United States Constitution and article I, § 10 of the Virginia Constitution.[1] At the suppression hearing, Wells denied being the driver of the vehicle, but asserted that as the registered owner he had a reasonable expectation of privacy in the vehicle which gave him standing to challenge the stop and search of the vehicle. Further, he argued that the vehicle was stopped illegally and that all of the evidence secured thereafter should have been suppressed as fruits of the illegal stop.

At the hearing on the motion the trial court noted that it would have to determine whether Wells had a possessory interest in the items seized and whether he had standing to challenge the stopping of his vehicle. Investigator Jan Stem of the Henrico County

---

[1] Article I, § 10 of the Virginia Constitution and the fourth amendment are substantively the same. *Lowe v. Commonwealth*, 230 Va. 346, 348 n.1, 337 S.E.2d 273, 274-75 n.1 (1985), *cert. denied*, 475 U.S. 1084 (1986). Thus, we will discuss the issue without distinction between the two constitutional provisions.

police department, who had prepared the affidavit to obtain the search warrant, testified that he arrived at the location of the vehicle within minutes after its driver fled. When Wells arrived shortly thereafter, he told Stem that he owned the Pinto, that he had been beaten, and the car stolen. Stem's affidavit, which was introduced as evidence, contained a statement of the facts as disclosed by both Officer Smith and Wells.

On the basis of Wells' testimony, the trial court ruled that he had no standing to challenge the stopping of the vehicle because if it were stolen, he did not have possession or control of it, and therefore had no expectation of privacy in the vehicle.[2] Wells was subsequently convicted by a jury of four counts of robbery and four counts of use of a firearm in the commission of a felony, and was sentenced to forty-eight years in prison.

We limited Wells' appeal to whether the trial court erred in denying his motion to suppress the items seized in the vehicle. We address: (1) the court's ruling that he had no expectation of privacy in his vehicle, which he claims was stolen but which the Commonwealth contends he was operating when stopped; (2) whether the police officer had an articulable and reasonable suspicion that the operator of the vehicle was involved in criminal activity in order to justify an investigatory stop, and whether he had a reasonable basis to conclude that the operator was armed and dangerous, justifying a pat-down for weapons; (3) whether the intrusion by the police officer's shining his flashlight into the vehicle to observe its contents constituted an illegal search; and (4) if the initial stop and search of the vehicle was illegal, whether the evidence observed could form the basis for probable cause to secure a search warrant.

### III.

First, we address whether Wells had standing to object to the stop of his vehicle which he alleged was stolen from him. The trial court ruled that he did not because, assuming the vehicle was stolen, as Wells contended, he did not have possession or control

---

[2] Since this concluded the hearing, Wells proffered for the record the evidence he would have tendered had he been permitted to continue with his evidence. We will not discuss the proffer further since there are no facts stated in it which were not contained in the evidence presented at trial.

when it was stopped and therefore, he had no expectation of privacy in the vehicle. We do not find it necessary to decide whether the owner of a stolen vehicle has any expectation of privacy in it.

In this case, the evidence was conflicting as to whether Wells' car was stolen and thus whether it was someone else who was stopped by Officer Smith. The trial court should have heard all the evidence the parties desired to produce at the suppression hearing on the standing issue, and based upon the facts produced made a factual finding whether Wells' vehicle was stolen or not. His failure to do so is of no consequence in this appeal, however, because the jury, in finding Wells guilty, implicitly made a factual determination that Wells' car was never stolen and that it was he who robbed the three businesses and was subsequently stopped by Officer Smith. We, therefore, view Wells as the driver of the vehicle.

■ Where, as here, the motion to suppress was renewed at the close of the presentation of all the evidence, an appellate court may consider the entire record in ruling on the correctness of a denial of a pretrial motion to suppress.[3] The Supreme Court stated in *Carroll v. United States*, 267 U.S. 132, 162 (1925):

> If the evidence given on the trial was sufficient, as we think it was, to sustain the introduction of the . . . evidence, it is immaterial that there was an inadequacy of evidence when application was made for its return. A conviction on adequate and admissible evidence should not be set aside on such a ground. The whole matter was gone into at trial, so no right of the defendants was infringed.

Based on *Carroll*, we held in *DePriest v. Commonwealth*, 4 Va. App. 577, 583, 359 S.E.2d 540, 542-43 (1987), that we may rely on the entire record, including testimony presented at trial, to determine the legality of a seizure. Although the Virginia Supreme Court has not decided the issue, a number of jurisdictions have likewise held that an appellate court may consider trial evidence in ruling on the correctness of a denial of a pretrial motion to

---

[3] In this case the motion to suppress was renewed at the completion of all the evidence. We make no ruling with respect to a case where the motion to suppress was not renewed because that case is not before us.

suppress. *See United States v. Canieso,* 470 F.2d 1224 (2d Cir. 1972); *United States v. Longmire,* 761 F.2d 411 (7th Cir. 1985); *Sanders v. State,* 235 Ga. 425, 219 S.E.2d 768 (1975), *cert. denied,* 425 U.S. 976 (1976); *People v. Braden,* 34 Ill. 2d 516, 216 N.E.2d 808 (1966); *State v. Beals,* 410 So. 2d 745 (La. 1982); *State v. Sharp,* 702 P.2d 959 (Mont. 1985). Accordingly, we will review the entire record to determine whether Wells had standing and whether his vehicle was illegally stopped and searched.

▮▮▮ In light of evidence adduced at trial and the jury's determination that Wells was operating the car when Officer Smith stopped it, we hold that Wells had standing to contest the stop. "[T]he question is whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Rakas v. Illinois,* 439 U.S. 128, 140 (1978). Fourth amendment protections are implicated when the defendant has "a legitimate expectation of privacy" in the property searched or seized. *Id.* at 143 (citing *Katz v. United States,* 389 U.S. 347, 353 (1967)). A car owner has a legitimate expectation of privacy as he travels the roads in his car, even though that expectation is not as great as the expectation of privacy in one's residence. *See United States v. Martinez-Fuerte,* 428 U.S. 543, 561 (1976). Therefore, we find that Wells had standing, as the owner and driver of the car, to contest the stop and search of his car.

## IV.

▮▮▮ Having ruled that Wells had standing to contest the stop and subsequent search of his vehicle, the crucial issue in this case is whether Officer Smith had a right to stop the suspect vehicle. In *Terry v. Ohio,* 392 U.S. 1, 22 (1968), the Supreme Court declared that a police officer may "in appropriate circumstances and in an appropriate manner" approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest. The Court defined the reasonable suspicion test as follows:

[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

*Id.* at 21-22 (footnote omitted).

▮ In *Adams v. Williams*, 407 U.S. 143, 145-46 (1972) (officer told by informant that "an individual . . . nearby . . . was carrying narcotics and a gun at his waist"), the Court further defined the scope of a *Terry* stop:

The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Id.* at 145-46 (citations omitted).

Chief Justice Burger gave a most comprehensive discussion on the investigatory stop in *United States v. Cortez*, 449 U.S. 411 (1981):

Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded sus-

picion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

*Id.* at 417-18 (citations omitted).

█ If there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, while attempting to obtain additional information. *DePriest v. Commonwealth*, 4 Va. App. 577, 585, 359 S.E.2d 540, 544 (1987).

With these principles in mind, we must now determine whether Officer Smith possessed specific and articulable facts which, based on the totality of the circumstances, warranted a man of reasonable caution in the belief that Wells may have been involved in criminal activity, thus justifying a stop of Wells' vehicle. First, Officer Smith indicated that a dark green Pinto pulled out abruptly in front of him, forcing him to apply his brakes quickly to avoid a collision. Such conduct on Wells' part may have constituted reckless driving but, even in the absence of a traffic violation, Officer Smith could reasonably conclude that the driver of the vehicle was in a hurry. Having just received a report that the Golden Skillet Restaurant only yards away had just been robbed, he could reasonably suspect that the driver of the vehicle might be the robber and was fleeing the scene.

Officer Smith also noted that the driver was a black male, the only information furnished to him through police communications. According to the record, Officer Smith had no knowledge of the suspect's wearing apparel, age, weight, height, or hair color or style. Although the police report indicated that the robber fled the scene on foot, Smith could reasonably assume there was a get-away car in the area. Obviously, the more information that is available to the police, the better the opportunity to identify the offender. The more comparisons that the police officer has available to him, the greater the likelihood that he will be able to establish a particularized and articulated basis for a stop.

■ In this case, Officer Smith was entitled to consider the suspect's racial identity as one factor in deciding whether to investigate further. *See Fouche v. United States*, 776 F.2d 1398, 1403 (9th Cir. 1985). Smith was in fact looking for a black man because of the reports of the other two robberies by a black male that had occurred in the area within the past twenty minutes.

■ Proximity to the scene of a recently committed crime is another factor which police may consider in determining whether to engage in a *Terry* stop. In *Howard v. Commonwealth*, 210 Va. 674, 173 S.E.2d 829 (1970), a dark complexioned man, wearing a ski mask, dark pants and sweater, robbed a Holiday Inn at gun point at 1:50 a.m. and escaped in a white Pontiac. A police officer followed such a vehicle into a residential area where the driver stopped his vehicle, ran, and disappeared. A K-9 dog tracked him for three or four blocks, where the scent was lost. About an hour

later, police stopped a taxi in the area. Upon finding that the driver picked up the passenger where the dog lost the scent and that the passenger wore only a shirt and trousers on a cold night, the police requested the passenger to get out of the taxi and identify himself. Noticing his pockets were bulging, they found in them a large amount of money and a pistol and arrested him. *Id.* at 675-76, 173 S.E.2d at 830-31. The Court held that "[i]t was not unreasonable under the circumstances here to detain the defendant in order for the detective in charge of the robbery investigation to question him as to his identity and reason for being in the area at that hour of the morning." *Id.* at 677-78, 173 S.E.2d at 832.

 Still another articulable fact leading to a reasonable suspicion of criminal activity is the conduct of a suspect. In *Terry* the officer observed several men pacing in front of a store for an extended period of time and repeatedly looking into the store window. Based upon the officer's thirty years of patrolling for shoplifters and pickpockets, he concluded by their movements that they were "casing a job, a stick-up." 392 U.S. at 6. The Supreme Court concluded that it "would have been poor police work" to not investigate this suspicious conduct. *Id.* at 23.

Officer Smith indicated that when Wells suddenly pulled out of the Shoney's parking lot in front of the police vehicle, Wells stared at the police officer, apparently surprised by his presence, crossed three lanes of traffic, and proceeded east. At the next intersection Wells jerked his head in Smith's direction three times. He then slumped down in his car "to where his head was pretty well even with the steering wheel," and drove away, maintaining the slumped position. After Smith notified police communications that he was following a suspicious black male driving a dark green Pinto, he signaled the suspect to stop with his red lights and siren, but the vehicle continued on at 40-45 miles per hour.[4] When the vehicle eventually pulled into a driveway marked "Do not enter," Smith followed to investigate further.

---

[4] The appellant's primary argument is that he was unconstitutionally stopped by Officer Smith. However, he ignored the siren and did not stop when Smith signalled him to do so. We do not decide whether this may preclude him from asserting that he was illegally stopped by the police. This issue was neither raised by the Commonwealth nor briefed by counsel.

In summary, Officer Smith knew that a black male had committed at least two robberies in the immediate vicinity and that a third had just occurred. He saw a black male pull out abruptly in front of him across the street from the most recent robbery. The driver drove erratically and acted suspiciously. When we consider the totality of the circumstances, we find that Officer Smith was possessed of specific and articulable facts which, together with reasonable inferences deducible therefrom, were sufficient to allow Smith to reasonably conclude that Wells may have been participating in criminal activity. Therefore, Smith was justified in stopping the vehicle to investigate.

## V.

Wells further contends that even if Officer Smith had specific and articulable facts to justify the stop, his conduct after stopping the vehicle was illegal. Wells argues that Smith exited his vehicle, drew his gun, and ordered Wells to stop and that this action constituted an arrest. Since Smith did not have probable cause to arrest at that time, Wells claims that all of his actions thereafter were illegal and the evidence observed in his vehicle should have been suppressed. Wells further contends that the officer had no reason to believe that he was armed and dangerous and, therefore, had no reason to frisk him even during a proper *Terry* stop. We disagree.

In *United States v. Jackson*, 652 F.2d 244 (2d Cir. 1981), a suspect in a bank robbery contended "that the restraints imposed during the stop of his vehicle exceeded the bounds of an investigatory stop," and that when "one of the two officers who made the stop drew his gun" he was illegally arrested. *Id.* at 249. As soon as the second officer frisked Jackson and found that he was not armed, the officer returned the gun to his holster. The court found that the officer acted reasonably in drawing his gun when approaching a car whose driver was suspected of armed robbery. "Although the drawing of a weapon may be a significant factor in determining whether a suspect is under arrest, it is not dispositive of the issue." *Id.* An officer who draws his gun, like an officer who frisks, need not be absolutely certain that the suspect is armed; "the issue is whether a reasonably prudent man under the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* An officer's belief that a suspect may

be armed and dangerous can be predicated on the nature of the criminal activity involved. *United States v. Oates*, 560 F.2d 45, 62 (2d Cir. 1977). Under the circumstances of this case, Officer Smith was fully justified in drawing his gun and frisking Wells to protect himself and his actions did not constitute an arrest.

## VI.

Wells next contends that Officer Smith's and Officer Pearce's actions in shining a flashlight into Wells' vehicle constituted an illegal search. We disagree. When the officers shined their flashlights into Wells' car and observed evidence of the robberies, Wells' fourth amendment rights were not violated. *See Texas v. Brown*, 460 U.S. 730, 739-40 (1983).

Additionally, we note that Wells surrendered his expectation of privacy in the vehicle and he had no standing to object to anything that transpired after he fled the scene. *See United States v. Edwards*, 441 F.2d 749 (5th Cir. 1971) (defendant's right to fourth amendment protection ended when he abandoned his car on a public highway and fled on foot as he no longer had reasonable expectation of privacy with respect to the automobile); *State v. Asbury*, 124 Ariz. 170, 602 P.2d 838 (1979) (when defendant stopped vehicle pursued by police and escaped on foot, he abandoned the vehicle); *State v. Childs*, 110 Ariz. 389, 519 P.2d 854 (1974) (defendant's right to fourth amendment protection ended when he abandoned his vehicle and fled on foot); *People v. Hampton*, 198 Colo. 566, 603 P.2d 135 (1979) (no standing to object to search after fleeing scene and abandoning vehicle); *Whitlock v. State*, 124 Ga. App. 599, 185 S.E.2d 90 (1971); *Hunt v. Commonwealth*, 488 S.W.2d 692 (Ky. 1972); *State v. Achter*, 512 S.W.2d 894 (Mo. Ct. App. 1974) (when pursued by patrolman, defendant left his car in the middle of the street, he relinquished any reasonable expectation of privacy in his automobile); *State v. Green*, 44 Or. App. 253, 605 P.2d 746 (1980).

Having concluded that Wells' detention, both in its inception and thereafter, was lawful and that the actions of the officers were otherwise lawful, the information acquired as a result thereof could properly be used to obtain the warrant to search the vehicle.

For the foregoing reasons, the trial court did not err in denying Wells' suppression motion and we affirm the judgment of the trial court.

*Affirmed.*

Benton, J., and Coleman, J., concurred.