COURT OF APPEALS OF VIRGINIA

Present:  Judges Benton, Annunziata and Senior Judge Cole
Argued at Richmond, Virginia


BRUCE WILLIAMS

v.          Record No. 0318-96-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE MARVIN F. COLE
AUGUST 19, 1997

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Thomas N. Nance, Judge

Patricia P. Nagel, Assistant Public Defender
(David J. Johnson, Public Defender, on
brief), for appellant.

Daniel J. Munroe, Assistant Attorney General
(James S. Gilmore, III, Attorney General, on
brief), for appellee.


Bruce Williams (appellant) entered a conditional guilty plea
to charges of possession of burglary tools, grand larceny, and
statutory burglary.  On appeal, he contends that the trial judge
erred in denying his motion to suppress the evidence.  We
disagree, and affirm appellant's convictions.

When a trial judge's denial of a motion to suppress is
reviewed on appeal, appellant has the burden to demonstrate that,
viewing the evidence in the light most favorable to the
Commonwealth, the judge's decision was reversible error.  Fore v.
Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980).
"On appeal, the judgment of the trial court is presumed correct.
The burden is on the party who alleges reversible error to show

---

[*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

by the record that reversal is the remedy to which he is entitled." Johnson v. Commonwealth, 12 Va. App. 391, 396, 404 S.E.2d 384, 387 (1991) (citation omitted). The decision of the trial judge will be disturbed only if plainly wrong. See Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). Our consideration of the record includes evidence adduced at both the trial and the suppression hearing. See DePriest v. Commonwealth, 4 Va. App. 577, 583, 359 S.E.2d 540, 542-43 (1987). See also Bynum v. Commonwealth, 23 Va. App. 412, 415, 477 S.E.2d 750, 752 (1996).

While we are bound to review de novo the ultimate questions of reasonable suspicion and probable cause, we "review findings of historical fact only for clear error and . . . give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. ___, ___, 116 S. Ct. 1657, 1663 (1996).

So viewed, the evidence proved that at 2:20 a.m. on October 13, 1995, Officer Berkley H. Eikerenkoetter and his partner, Officer David Ernest, were traveling northbound on Allen Avenue in Richmond when they observed defendant, later identified as Bruce Williams, walking southbound on Allen Avenue between Parkwood and Grayland Avenues in the direction of the officers and Grayland Avenue. Williams was crossing over a highway overpass between Parkwood and Grayland Avenues. He was pulling a super can. This activity attracted the attention of Officer

-2-

Eikerenkoetter, who was driving the police car, and he pulled the car to the center of Allen Avenue and stopped. Officer Eikerenkoetter testified Williams' action was suspicious because he had arrested and convicted, in the past, persons using super cans to conceal stolen property. He stopped to talk with the person pulling the can.

Williams admitted that he had crossed the overpass and was at the intersection of Grayland and Allen Avenues. Officer Eikerenkoetter at the suppression hearing drew a diagram showing where he stopped the police car and where the defendant was walking. The diagram established that the police car was parked adjacent to the centerline of Allen Avenue and on a diagonal, but all within the northbound traffic lane of Allen Avenue. The car was close to the south curbline of Grayland Avenue, but had not entered it. The defendant was walking in the southbound lane of Allen Avenue near the western curbline of Allen Avenue. Because the time of night was 2:20 a.m., the officer testified that he stopped diagonally in Allen Avenue in order to see Williams in the police car headlights. Nothing in the record suggests that the light blinded Williams, or affected him in any way, as he contends.

Super cans are issued by the City of Richmond to all residents, who use them as containers to hold trash and refuse. The residents place the cans beside the street in front of their homes, and the trash is collected periodically by the city trash

collectors.

Officer Eikerenkoetter testified that the area was known for violence, homicides and criminal activity. He stated that the nature of the area was a big factor in the establishment of a police precinct there. Eikerenkoetter was experienced with the use of super cans. He testified that prior to this incident, he had observed a man pulling a super can in the same area. He investigated and the man fled the scene, leaving the super can behind. It contained a stolen air conditioner. He further testified that he had arrested people for concealing property in super cans and had obtained convictions. He testified that he stopped and approached Williams because he suspected that he was concealing stolen property in the can.

Eikerenkoetter testified that he exited the driver's door and approached Williams. His partner got out of the passenger's door and approached Williams from behind. Nothing in the record suggests that Williams was blocked or prevented from leaving the scene in any direction if he desired to do so, as he now argues.

The following conversation ensued:

Eikerenkoetter: How are you doing? Man, what are you doing?

Williams: Nothing.

Eikerenkoetter: What [have] you got in the can?

Williams: Nothing.

Eikerenkoetter: Do you have any weapons or drugs on you that I need to know about?

Williams:  No.

Eikerenkoetter:  Do you mind if I check?

Williams did not make any response to this question. Eikerenkoetter testified that when he was not permitted to check for weapons or drugs, he patted down Williams' outer clothing "for [the] safety of myself and Officer Ernest."

During the pat-down, Eikerenkoetter felt a long, hard object in Williams' jacket pocket. He asked what the object was, but Williams did not answer. The officer reached into the pocket and removed the item, which was a fourteen inch long screwdriver. He felt other hard objects in the pocket, removed them, and found them to be a pair of pliers, a pair of scissors, and wire cutters.

Based upon the "time of the morning and the circumstances," Eikerenkoetter concluded that the items in Williams' possession were burglary tools. He again asked what was in the super can, and again Williams did not answer. Officer Ernest then opened the can and found property later determined to have been stolen from a nearby business.

Eikerenkoetter observed two sets of numbers on the can. One was the City assigned number, and the other was the spray painted number 1616. Upon seeing the number, Eikerenkoetter had other police units check around the 1600 block of Cary Street because both businesses and residences were located there and was only a block away from the overpass in the direction from which Williams

was coming.  At the trial of the case, the Commonwealth's attorney proffered the evidence.  A business in the 1600 block of Cary Street was broken into with what appeared to be a screwdriver.  Stolen from the business was a computer, office equipment and several car stereos.  These articles were found in the super can.

In this case, we hold that Officer Eikerenkoetter had reasonable articulable suspicion that Williams may have been engaged in criminal activity and was armed and dangerous.  Consequently, a stop pursuant to Terry v. Ohio, 392 U.S. 1 (1963), and a pat-down were justified.  Upon finding the burglary tools during the pat-down, Eikerenkoetter had probable cause to arrest Williams.  Incident to the arrest, he was justified in searching Williams and the super can.

In assessing the propriety of the trial court's ruling, we keep in mind that the Fourth Amendment does not proscribe all searches and seizures, only those that are "unreasonable."  See id. at 9.

> Courts must apply objective standards in determining whether the requisite degree of suspicion exists, taking into account that "trained law enforcement officers may be 'able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer.'"  Attention must be focused on objective reasonableness rather than on the police officer's subjective intent.

Castaneda v. Commonwealth, 7 Va. App. 574, 580, 376 S.E.2d 82, 85 (1989) (reh'g en banc) (citation omitted).

-6-

The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, <u>Terry</u> recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

<u>Adams v. Williams</u>, 407 U.S. 143, 145-46 (1972). <u>See</u> <u>also</u> <u>Harmon v. Commonwealth</u>, 15 Va. App. 440, 444, 425 S.E.2d 77, 79 (1992).

It is an established principle that a brief detention for investigative purposes is justified when an officer has reasonable suspicion supported by articulable facts that "criminal activity may be afoot." <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989). "[I]nnocent behavior will frequently provide the basis for a showing of [reasonable suspicion], . . . and . . . '[i]n making a determination of [reasonable suspicion] . . . the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.'" <u>Id.</u> at 10 (citation omitted). "Actual proof that criminal activity <u>is</u> afoot is not necessary; the record need only show that it <u>may</u> be afoot." <u>Harmon</u>, 15 Va. App. at 444, 425 S.E.2d at 79.

"There is no 'litmus test' for reasonable suspicion. Each instance of police conduct must be judged for reasonableness in light of the particular circumstances." "In order to determine what cause is sufficient to authorize police to stop a person, cognizance

> must be taken of the 'totality of the
> circumstances -- the whole picture.'"

Id. at 445, 425 S.E.2d at 79 (citations omitted).

Officer Eikerenkoetter testified that he was in an area known for violence, homicides and criminal activity. He stated that the nature of the area was a big factor in the establishment of a police precinct in the area. Eikerenkoetter had had some experience with super cans. He testified that prior to this incident, he had observed a man pulling a super can in the same area. He investigated the situation and the man fled. He left the super can behind and it contained a stolen air conditioner. He further testified that he had arrested people for concealing property in super cans and had obtained convictions. Eikerenkoetter testified that he approached Williams because he suspected that he was concealing stolen property in the super can.

The trial judge, recognizing that it was his responsibility to determine the objectiveness of the officer's actions, stated, "I think the police officer, in this situation -- if he didn't suspect something was going on . . . he wouldn't be doing his job. He would just be riding around out there." We find credible evidence in the record to support the decision of the trial judge that Officer Eikerenkoetter had reasonable suspicion supported by articulable facts that "criminal activity may be afoot" and was justified in detaining Williams for a reasonable period to investigate to dispel or confirm his suspicions.

-8-

> In conjunction with a lawful investigative detention, an officer may conduct a patdown search of a suspect's outer clothing if he can "'point to specific and articulable facts which, taken together with rational inferences from those facts,'" reasonably lead him to conclude, "in light of his experience, that 'criminal activity may be afoot' and that the suspect 'may be armed and presently dangerous.'"

Stanley v. Commonwealth, 16 Va. App. 873, 875, 433 S.E.2d 512, 513 (1993) (citations omitted). Among the circumstances to be considered in this situation are "the 'characteristics of the area' where the stop occurs, the time of the stop, whether late at night or not, . . . any suspicious conduct of the person accosted such as an obvious attempt to avoid officers or any nervous conduct on the discovery of their presence,'" and "the character of the offense which the individual is suspected of committing." Williams v. Commonwealth, 4 Va. App. 53, 67, 354 S.E.2d 79, 87 (1987) (citation omitted).

"'[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" Taylor v. Commonwealth, 10 Va. App. 260, 264, 391 S.E.2d 592, 594 (1990) (citation omitted). "'The purpose of [a] limited search [for weapons] is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.'" Bolda v. Commonwealth, 15 Va. App. 315, 319, 423 S.E.2d 204, 207 (1992) (citation omitted). Furthermore, the officer is entitled to view the circumstances confronting him in the light of his training

and experience.  See Terry, 392 U.S. at 27.

In this case, the same facts that support reasonable suspicion that "criminal activity may be afoot" also support the officers' conclusion that "the suspect may be armed and presently dangerous."  These facts and circumstances will not be repeated in detail but are applicable to show knowledge and information possessed by the officers.  These facts alone are sufficient for the fact finder to conclude that Eikerenkoetter was justified in patting down Williams' outer clothing for weapons.

At this time, Eikerenkoetter possessed the following facts: (1) he was in an area known for violence, homicides and criminal activity; (2) the time was 2:20 a.m., and the only light was from the headlights of the police car; (3) he had arrested people for concealing property in super cans, had obtained convictions, and he now suspected that Williams was concealing property in a super can, a serious criminal act; (4) Williams was pulling a super can over a highway overpass, a place where a super can would not normally be found, particularly at 2:20 a.m.; (5) Williams' statement to the officer that nothing was in the can made his activity even more suspicious under the circumstances; (6) super cans are usually found at residences and not on highway overpasses; and (7) the only reasonable use for a super can at the time and place involved here is to conceal stolen property. When Williams refused to cooperate with Eikerenkoetter and answer questions about weapons or drugs, Williams became fearful for his

safety and that of his partner and he patted down Williams' outer clothing. We find that, under the totality of all of these circumstances, Eikerenkoetter was justified in patting down Williams for weapons for his safety and that of his partner. See Nelson v. Commonwealth, 24 Va. App. 823, 485 S.E.2d 673 (1997) (suspicion that defendant had been involved in a burglary, a potentially violent felony, justified a pat-down for weapons to ensure officer safety during the stop).

During the pat-down, Eikerenkoetter felt a long, hard object in Williams' jacket pocket. He asked what the object was, but Williams made no response. Believing the object to be a weapon, the officer reached into the pocket and removed the item, which was a fourteen inch long screwdriver. He felt other hard objects in the pocket, removed them from the pocket, and found them to be a pair of pliers, a pair of scissors, and wire cutters.

Based upon the "time of the morning and the circumstances" Eikerenkoetter concluded that the items in Williams' possession were burglary tools. He again asked what was in the super can, and Williams did not reply. Ernest then opened the can and found the property stolen from a nearby store.

In the light of Eikerenkoetter's prior experience with super cans used to conceal evidence of theft, the time of night the officer observed appellant pulling the can, and the nature of the area where appellant was found, the officer had probable cause to arrest appellant for the possession of burglary tools. See Ford

-11-

v. City of Newport News, 23 Va. App. 137, 143-44, 474 S.E.2d 848, 851 (1996) (to establish probable cause to arrest there must be "a probability or substantial chance of criminal activity, not an actual showing of such activity").

The police were entitled to search appellant and the super can incident to appellant's arrest for the possession of burglary tools. See New York v. Belton, 453 U.S. 454, 460 (1981); Hall v. Commonwealth, 12 Va. App. 559, 564, 389 S.E.2d 921, 924 (1990). "So long as probable cause to arrest exists at the time of the search, . . . it is unimportant that the search preceded the formal arrest if the arrest '"followed quickly on the heels of the challenged search."'" Carter v. Commonwealth, 9 Va. App. 310, 312, 387 S.E.2d 505, 506-07 (1990) (quoting Wright v. Commonwealth, 222 Va. 188, 193, 278 S.E.2d 849, 852-53 (1981)). Thus, it was immaterial that appellant was not actually placed under arrest until after the search of the super can.

For the reasons stated, the trial judge did not err in denying the motion to suppress.

Affirmed.

Benton, J., dissenting.

I would hold that the police officers unlawfully seized and searched Bruce Williams.  Therefore, I dissent.

"[W]henever a police officer accosts an individual and restrains [that individual's] freedom to walk away, [the officer] has 'seized' that person."  Terry v. Ohio, 392 U.S. 1, 16 (1968).  By the show of authority, the police may convey such a threatening presence that "a reasonable person would have believed that he was not free to leave."  United States v. Mendenhall, 446 U.S. 544, 554 (1980).  On appeal, we review the determination of reasonable suspicion de novo.  See Ornelas v. United States, 517 U.S. ___, ___, 116 S. Ct. 1657, 1663 (1996).

The evidence proved that when the officers saw Williams with the trash can, they stopped the car in the middle of the street and parked diagonally with the headlights of their patrol car shining upon Williams.[1]  The officers got out of the vehicle and accosted Williams, with one officer standing behind him and the other officer in front of him.  The officers did not request permission to speak with Williams.  Instead, they began questioning him.  They asked him what he was doing, what was in

---

[1]The evidence proved that the officers saw Williams walking "southbound on Allen Avenue between Parkwood and Grayland," in the City of Richmond.  The evidence further proved that "there are residences there."  Although some businesses were on nearby Cary Street, the evidence proved Williams was stopped at the intersection of Allen Avenue and Grayland Street in a residential area.  He had just crossed an overpass from Parkwood Avenue that led to a residential neighborhood.  No evidence proved that Parkwood Avenue is not residential.

–13–

the can, and whether he had weapons or drugs.  Under these circumstances, a reasonable person in Williams' position would not have believed that he was free to leave.  See Mendenhall, 446 U.S. at 554.

Furthermore, the officers lacked a reasonable articulable suspicion that Williams was engaged in criminal activity. Although the principle is well established that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior," Terry, 392 U.S. at 22, the principle is equally well established that "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  Id. at 21.  The officer's testimony of the facts and observations that gave rise to the stop must amount to more than an "inchoate and unparticularized suspicion or 'hunch.'"  Id. at 27.  "When examining the officer's articulable reasons for stopping a person, we examine the objective reasonableness of the officer's behavior rather than the officer's subjective belief that the conduct indicates criminal activity."  Riley v. Commonwealth, 13 Va. App. 494, 496-97, 412 S.E.2d 724, 725 (1992).

The officers stopped Williams "because of . . . suspicions." The officers had no information that Williams was wanted on a criminal charge and they had no information that a criminal

-14-

offense had occurred that might have involved Williams.  The officers' observation that Williams was moving a trash can simply was not a basis to reasonably believe that he was engaged in criminal conduct.[2]  The guarantee of the Fourth Amendment protects persons who carry their belongings in bags, boxes, and cans just as it protects executives who carry locked attache' cases.  See Smith v. Ohio, 494 U.S. 541, 542 (1990).

Nothing about Williams' actions was criminal or illegal. His conduct, "viewed either in isolation as the officer considered it or along with the other behavior as the court must examine it, is utterly insufficient to generate a reasonable suspicion that defendant was involved in criminal activity." Zimmerman v. Commonwealth, 234 Va. 609, 612, 363 S.E.2d 708, 710 (1988).  Unusual conduct that the officer deems suspicious does not ipso facto justify a stop.  See id.  Even when "[t]he record suggests an understandable desire to assert a police presence . . . , that purpose does not negate Fourth Amendment guarantees."  Brown v. Texas, 443 U.S. 47, 52 (1979).

Furthermore, the officer gave no particularized reason to support frisking Williams.  The officers did not ask for Williams' name or address.  They did not ask Williams if he would consent to being questioned.  One of the officers immediately began to question Williams by asking, "what are you doing?"

---

[2]I cannot agree with the majority's conclusion that "the only reasonable use for a super can at the time and place involved here is to conceal stolen property."

Williams responded to all of the officers' preliminary questions. Williams did not, however, give his consent to be searched. Nonetheless, the officer searched Williams' pockets and the trash can.

The officer testified that he always frisks people that he stops "in that particular area" of the city. That generalized statement of the officer's usual conduct does not support a finding that the officers had specific and particular facts upon which to believe Williams was armed and dangerous. "The 'narrow scope' of the Terry exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked . . . ." Ybarra v. Illinois, 444 U.S. 85, 94 (1979).

> In every encounter, "Terry requires reasonable, individualized suspicion before a frisk for weapons can be conducted." The officer's generalized policy of frisking all persons does not satisfy the restrictions imposed by Terry. "Indeed, if everyone is assumed to be armed and dangerous until the officer is satisfied that he or she is not, then officers would be able to frisk at will -- a result not contemplated by the Fourth Amendment."

Sattler v. Commonwealth, 20 Va. App. 366, 369, 457 S.E.2d 398, 400 (1995) (citations omitted).

Because the record proved insufficient justification for the stop, frisk, and search, I would reverse the trial judge's refusal to suppress the evidence.

I dissent.