## CIRCUIT COURT OF FAIRFAX COUNTY

Commonwealth of Virginia

 v.

Thomas W. Morgan, Jr.

October 6, 2000

Case No. (Criminal) 97704

BY JUDGE STANLEY P. KLEIN

 Defendant Thomas W. Morgan, Jr., moves the Court to suppress the following: (1) his statement to Investigator J. D. Bean that he had one alcoholic drink during the night in question; (2) the marginal results of his field coordination tests; (3) the 0.06 blood alcohol content result from his breath test; (4) the opened bottle of Baccardi rum found in his car subsequent to his arrest; and (5) his later statement to Detective Thompson that he had one alcoholic drink earlier that night. In support of his motion, Morgan claims (1) that no reasonable articulable suspicion existed for the police to initially seize him, (2) that the length of, and police inaction during, any valid investigatory stop transformed the stop into the functional equivalent of an arrest without probable cause, (3) that his statement to Investigator Bean resulted from a custodial interrogation without Miranda warnings and therefore violated his Fifth Amendment rights, (4) that the warrantless search of his vehicle did not fall within the scope of any of the exceptions to the warrant requirement rule and therefore violated the Fourth Amendment, and (5) his later statement to Detective Thompson was again elicited without proper Miranda warnings and therefore violated his Fifth Amendment rights. For the reasons that follow, the Court finds the prolonged detention of Morgan awaiting Investigator Bean's arrival on the scene cannot be justified under the applicable Fourth

580

Amendment authorities. Accordingly, the Defendant's motion to suppress must be granted in its entirety.

## I. *Background*

On October 18, 1999, just before 10:00 p.m., a car driven by Morgan collided with an automobile driven by Jerry Vincent Witt at the intersection of Backlick Road and Spring Garden in Fairfax County. Shortly after 10:00 p.m., Officer Burke, an experienced Fairfax County police patrolman arrived at the scene. Burke saw the Witt vehicle in the middle of the intersection where people were attempting to give assistance to one of the car's occupants. He next observed Morgan walking toward the intersection. Witnesses, and then Morgan himself, identified him as the driver of the other vehicle in the accident. Burke requested that Morgan turn over his license and registration and Morgan complied. Burke asked Morgan what had occurred and Morgan advised that he had gone through a green light at the intersection and was struck by the Witt vehicle. Witnesses had informed Burke that Morgan's vehicle had in fact driven through a red light. Burke also noticed a "moderate" odor of alcohol emanating from Morgan, whose eyes were bloodshot, and Burke therefore directed Morgan to wait on the corner next to Burke's cruiser while Burke checked on the condition of the other driver. Neither Morgan's license nor registration was returned to him and the Commonwealth stipulates that Morgan was never thereafter free to leave the scene.

At approximately 10:09 p.m., Sergeant Cox of the Fairfax County Police Department arrived at the scene in a separate cruiser and met with Burke shortly thereafter. Cox secured the accident scene and routed traffic around the Witt automobile. Within ten to fifteen minutes of his arrival, six to eight officers were present and no less than two police cruisers, with their emergency equipment activated, were also at the accident scene. At least Cox and Burke were in full uniform with their firearms displayed. Cox spoke to Morgan within five to ten minutes of his arrival at the scene and determined that the Defendant had been one of the drivers in the accident; however, Morgan and a passenger in the Witt automobile gave conflicting accounts of who had the green light at the time of the collision. Further, Cox noticed an odor of alcohol about the Defendant who was slightly unsteady on his feet. Morgan was, however, responsive to all of his questions during the approximately ten to fifteen minutes that Cox conversed with him.

Between ten and fifteen minutes after Cox arrived at the scene, he was advised that the injuries to Witt were potentially life-threatening. As a result, consistent with a Fairfax County Police Department policy, Cox requested that

a member of the Accident Reconstruction Unit (ARU) respond to the scene of the accident. At that time, according to Cox, Morgan was a suspect in a potential driving while intoxicated (DWI) or manslaughter case and was not free to leave. In accordance with the police department policy, no further questioning or testing of Morgan took place until ARU Investigator James D. Bean arrived at the scene. Cox explained that this aspect of the Department's policy was intended to avoid unnecessary repetition of work by the ARU members. According to Cox, Bean arrived forty-eight minutes after Cox placed his phone call to the police dispatcher.

Investigator Bean, a seventeen-year member of the ARU, testified that he arrived at the scene of the accident at 10:48 p.m.[1] Bean had received a phone call at his home advising him to report to the accident scene. When he arrived, he observed a number of police vehicles and other vehicles blocking the intersection and spoke briefly with Burke, who advised him of the results of his initial limited investigation. Bean next spoke to Morgan and inquired (1) whether he was the other driver, (2) where he was coming from, and (3) whether he had been drinking that evening. Morgan responded that he was the driver, was on his way home from work at a glass shop, and had consumed one drink of Baccardi rum earlier that evening. Investigator Bean then asked Officer Burke to run Morgan through a series of field coordination tests. Burke initially instructed Morgan to recite the alphabet, which Morgan accomplished without error. Burke then asked Morgan to count backwards from 88 to 77. Morgan accurately counted to 79, repeated 80 and then counted to 70, notwithstanding the instruction to count to 77. Burke next asked Morgan to walk heel-to-toe nine steps out and nine steps back while counting each step. Morgan successfully walked and counted nine steps out but counted his first step back twice and did not return precisely heel to toe. Finally, Burke instructed Morgan to complete a nose touching dexterity test. Although he did touch the tip of his nose with the top of his finger each time, Morgan did not fully extend his arms before reaching for his nose as Burke had instructed him to do. Investigator Bean took no active part in conducting the field coordination tests other than to observe the results. According to Bean, after Morgan completed the field coordination tests, Burke placed the Defendant under arrest for DWI. Officer Burke offered the Defendant an alkasensor pursuant to Va. Code § 18.2-267 before placing Morgan under arrest.

---

[1] Bean would have arrived at the scene between 11:07 and 11:12 p.m. according to Sergeant Cox's recollection. The Court agrees with counsel, however, that this difference in recollection is not highly significant in the overall analysis.

Mr. Witt subsequently died from the injuries he suffered in the accident. Morgan has been indicted on a charge of Involuntary Manslaughter and now challenges the constitutionality of his warrantless seizure, detention, and interrogations and the warrantless search of his automobile.

## II. *Analysis*

### A. *United States Supreme Court Case Law*

Historically, all official seizures of a person required the existence of probable cause. See *Michigan v. Summers*, 452 U.S. 692, 696, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981); *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979). In *Dunaway*, the U.S. Supreme Court articulated the historical rationale underlying the probable cause requirement:

> The central importance of the probable cause requirement to the protection of a citizen's privacy afforded by the Fourth Amendment's guarantees cannot be compromised in this fashion. "The requirement of probable cause has roots that are deep in our history." *Henry v. United States*, 361 U.S. 98, 100, 4 L. Ed. 2d 134, 80 S. Ct. 168 (1959). Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its adoption affirmed that "common rumor or report, suspicion, or even strong reason to suspect was not adequate to support a warrant for arrest." *Henry*, 361 U.S. at 101 (footnotes omitted). The familiar threshold standard of probable cause for Fourth Amendment seizures reflects the benefit of extensive experience accommodating the factors relevant to the "reasonableness" · requirement of the Fourth Amendment, and provides the relative simplicity and clarity necessary to the implementation of a workable rule. See *Brinegar v. United States*, 338 U.S. 160, 175-76, 93 L. Ed. 1879, 69 S. Ct. 1302 (1949).

*Dunaway*, 442 U.S. at 213.

In 1968, in the landmark case of *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), the Supreme Court "recognized the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause." *Michigan v. Summers*, 452 U.S. 692, 698, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981) (citing *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)). In *Terry*,

the Supreme Court held that the "narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer" could be based on less than probable cause provided the officer is acting on "specific reasonable inferences, which he is entitled to draw from the facts in light of his experience [rather than] an inchoate and unparticularized suspicion or hunch." 392 U.S. at 27 (punctuation altered). The Court in *Terry* established a two-step inquiry for determining the legality of an investigative stop. First, a reviewing court must evaluate "whether the officer's action was justified at its inception;" and second, "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20.

Decisions of the Supreme Court since *Terry v. Ohio* have delineated the evolving parameters of the "*Terry* stop exception." See *United States v. Sharpe*, 470 U.S. 675, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985); *United States v. Place*, 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983); *Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983); *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975); *Adams v. Williams*, 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972). See also *Hayes v. Florida*, 470 U.S. 811, 815-16, 84 L. Ed. 2d 705, 105 S. Ct. 1643 (1985) (invalidating a detention at a police station for fingerprinting purposes when no probable cause to arrest existed); *United States v. Hensley*, 469 U.S. 221, 83 L. Ed. 2d 604, 105 S. Ct. 675 (1985) (upholding a *Terry* stop of an individual suspected of a past felony based upon a "wanted" flyer from another police department); *Michigan v. Summers*, 452 U.S. 692, 698, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981) (upholding detention of occupant of residence during search warrant execution); *Delaware v. Prouse*, 440 U.S. 648, 663, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979) (allowing automobile stops based upon reasonable suspicion). While a *Terry* stop is not necessarily "confined to the momentary on-the-street detention accompanied by a frisk for weapons involved in *Terry* and *Adams*," the rule enunciated in *Terry*, that a seizure can be effectuated on less than probable cause, remains the exception, not the rule. *Michigan v. Summers*, 452 U.S. at 700.

In *Adams v. Williams*, 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972), the Supreme Court upheld the forcible stop of a suspect based upon a reliable informant's tip that the suspect was armed and carrying illegal drugs. Although probable cause did not exist, the Court found that its decision in *Terry* was controlling. Pursuant to *Terry*, the *Adams* court recognized that "a policeman making a reasonable investigatory stop may conduct a limited protective search for concealed weapons when he has reason to believe that the suspect is armed and dangerous." 407 U.S. at 143.

Next in *United States v. Brignoni-Ponce*, 422 U.S. 873, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975), the Supreme Court upheld a vehicle stop based upon reasonable suspicion in the context of a border patrol search for illegal aliens. The Supreme Court noted that "the interest in controlling the influx of illegal aliens justified the limited intrusion, usually lasting no more than a minute, involved in the stop." *Id*. at 880.

Four years later in *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979), however, the Supreme Court declined to extend the *Terry* doctrine to the seizure of an individual who, although not placed under formal arrest, was transported to a police station to be interrogated. The Court noted that "the detention of petitioner was in important respects indistinguishable from a traditional arrest." 442 U.S. at 212. The Court explicitly rejected the State's argument that the serious nature of the crime warranted the intrusion, opining that "any 'exception' that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Id*.

In 1983, in *Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983), the Supreme Court addressed the propriety of the detention of an individual at an airport who fit the "drug courier profile." The suspect was asked to accompany the police from a public area to a police room while the police retained his airline ticket and driver's license. The Defendant's luggage was brought to the police room without his consent and he was asked if he would consent to a search of his luggage. Royer produced a key, the luggage was opened and marijuana was discovered. The Supreme Court's opinion articulated that although there is no "litmus-paper test . . . for determining when a seizure exceeds the bounds of an investigative stop,"[2] certain factors must be considered in determining the propriety of such a seizure. The Court in *Royer* stated:

> This much, however, is clear — an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

---

[2] *Florida v. Royer*, 460 U.S. 491, 506, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983).

460 U.S. at 501 (citations omitted and punctuation altered). See also *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975); *Adams v. Williams*, 407 U.S. 143, 146, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972).

That same year, the Supreme Court also addressed the legality of a temporary detention of a traveler's luggage for investigatory purposes in *United States v. Place*, 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983). The Court applied the *Terry* rationale and ruled that a "brief seizure" of luggage could be effected when the authorities possessed a reasonable belief, based on articulable facts, that the luggage contained narcotics. 462 U.S. at 703. The Court held, however, that the ninety-minute detention of the luggage in that case, while the authorities attempted to secure the use of a trained narcotics detection dog, could not be justified by its decision in *Terry*. While declining to adopt any "outside time limitation for a permissible *Terry* stop,"[3] the Court held as follows:

> The length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause. Although we have recognized the reasonableness of seizures longer than the momentary ones involved in *Terry, Adams*, and *Brignoni-Ponce*, the brevity of the invasion of the individual's Fourth Amendment interest is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion. Moreover, in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation.

462 U.S. at 709 (citation omitted).

Finally, in 1985, the U.S. Supreme Court decided *United States v. Sharpe*, 470 U.S. 675, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985), the seminal case on the issue of the scope of investigative detentions. In *Sharpe*, a DEA agent in an unmarked car, patrolling on a suspected drug-trafficking highway, noticed a pickup truck and a Pontiac Bonneville driving in tandem. The pickup, which was riding low in the rear, had an attached camper, which did not sway or bounce appreciably when it went over bumps. Based upon his experience, the DEA agent suspected that the truck was transporting drugs and he decided to make an "investigative stop." Needing a marked car to effectuate the stop, the Agent radioed the South Carolina Highway Patrol for assistance. The drivers

---

[3] *United States v. Place*, 462 U.S. 696, 709, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983).

of the truck and Pontiac tried to depart the area upon seeing the South Carolina police cruiser. Eventually, the Highway Patrol officer pulled over the Pontiac, but as he did, the pickup truck fled the scene. The Highway Patrol officer then pursued the pickup and the DEA agent pulled in behind the Pontiac to investigate. The DEA agent obtained identification from the driver of the Pontiac and then radioed the local police for assistance. When South Carolina backup arrived, the agent proceeded to where the original Highway Patrolman had pulled over the truck, approximately one-half mile down the road.

The Highway Patrol officer had stopped the truck and ordered its driver out at gunpoint. The officer informed the driver he was being detained pending the arrival of a DEA agent, and advised the driver he was not free to go. The DEA agent arrived approximately fifteen minutes after the truck had been pulled over, and after an additional five minutes of investigation, the DEA agent was able to establish probable cause that there was marijuana in the truck and both drivers were placed under arrest for narcotics violations. The drivers sought suppression of the marijuana, arguing, *inter alia*, that the discovery of the drugs arose from the truck driver's illegally prolonged detention.

In the Supreme Court's opinion, Chief Justice Burger framed the issue as "Whether an individual reasonably suspected of engaging in criminal activity may be detained for a period of twenty minutes, when the detention is necessary for law enforcement officers to conduct a limited investigation of the suspected criminal activity." *Sharpe*, 470 U.S. at 676-77. In deciding the issue in *Sharpe*, the Court reviewed and reaffirmed its decisions in *Terry*, *Dunaway, Royer*, and *Place* and eschewed the establishment of a "bright-line" rule, opining that "common sense and ordinary human experience must govern over rigid criteria." *Sharpe*, 470 U.S. at 685. The Court then articulated the test to be applied in determining whether a detention is too prolonged to constitute a permissible investigative stop:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police *diligently* pursued a means of investigation that was likely to confirm or dispel their suspicions *quickly*, during which time it was *necessary* to detain the Defendant.

470 U.S. at 686 (emphasis added). Finding that the twenty-minute detention was not unreasonable in light of the pickup driver's evasive actions and the diligence of the DEA agent and other officers, the Supreme Court reversed the Court of Appeals' decision suppressing the drugs.

B. *Virginia Case Law*

The Virginia Court of Appeals has adopted the mode of analysis prescribed by the United States Supreme Court in *Royer, Place*, and *Sharpe* in determining the propriety of investigative detentions. See *Harris v. Commonwealth*, 33 Va. App. xx (Aug. 29, 2000); *Washington v. Commonwealth*, 29 Va. App. 5, 509 S.E.2d 512 (1999) (en banc); *Ford v. Commonwealth*, 28 Va. App. 249, 503 S.E.2d 803 (1998); *Thomas v. Commonwealth*, 16 Va. App. 851, 856-57, 434 S.E.2d 319 (1993), aff'd 18 Va. App. 454, 444 S.E.2d 275 (1994) (en banc); *Burgess v. Commonwealth*, 14 Va. App. 1018, 1022, 421 S.E.2d 664 (1992); *Limonja v. Commonwealth*, 8 Va. App. 532, 383 S.E.2d 476 (1989) (en banc); *DePriest v. Commonwealth*, 4 Va. App. 577, 359 S.E.2d 540 (1987). In *Washington*, the Virginia Court of Appeals, sitting *en banc*, articulated the test to be applied in Virginia: "The test is whether the police methods were calculated to confirm or dispel the suspicion *quickly* and with *minimal intrusion* upon the person detained." 29 Va. App. at 15 (citation omitted) (emphasis supplied).

C. *Application*

1. *The Initial Stop*

In this matter, the Commonwealth concedes that when Morgan turned over his license to Officer Burke and Burke retained it, Morgan had been "seized" for Fourth Amendment purposes. See *Richmond v. Commonwealth*, 22 Va. App. 257, 261-62, 468 S.E.2d 708 (1996); *Brown v. Commonwealth*, 17 Va. App. 694, 697, 440 S.E.2d 619 (1994). At oral argument, the Commonwealth stipulated that once Burke instructed Morgan to stand and wait by the cruiser, Morgan was not free to leave and would have been prevented from doing so if he had tried.

Morgan first argues that Burke had no reasonable articulable suspicion to effect a *Terry* stop when Burke initially seized him. Although the Commonwealth does not argue that probable cause to arrest Morgan existed prior to Morgan's completion of the field coordination tests,[4] the Commonwealth asserts that Burke's testimony at the suppression hearing

---

[4] The Commonwealth argued, on brief, that the observations of Morgan "led to concerns about the Defendant's level of intoxication." Only after Morgan admitted to drinking and did not successfully complete the field sobriety tests did the Commonwealth assert probable cause to arrest existed. See Commonwealth's Memorandum in Opposition to Suppression at 3.

established "a reasonable and articulable suspicion of criminal activity on the part of the Defendant,"[5] based upon "the totality of the circumstances." *Wells v. Commonwealth*, 6 Va. App. 541, 555, 371 S.E.2d 19 (1988) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18, 66 L. Ed. 2d 621, 101 S. Ct. 690 (1981)). The Court agrees with the Commonwealth.

Burke testified that he arrived at the scene of the accident shortly after 10:00 p.m. He saw Morgan walking to the intersection and determined that he was the driver of the second car in the accident. Morgan told Officer Burke that he had proceeded into the intersection under a green light, which was contradicted by at least one other witness. Although Burke did not note anything unusual about Morgan's complexion, speech, or balance, he did notice a moderate odor of alcohol about Morgan and that his eyes were bloodshot.

"Reasonable suspicion is a less demanding standard than probable cause . . . in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause. . . ." *Washington*, 29 Va. App. at 12 (quoting *Alabama v. White*, 496 U.S. 325, 330, 110 L. Ed. 2d 301, 110 S. Ct. 2412 (1990)). The existing circumstances articulated by Officer Burke were more than a mere "inchoate hunch" and were based on objective facts. As such, Officer Burke had a legitimate basis to conduct an initial investigatory stop of Morgan.

## 2. *The Detention*

Morgan next asserts that even if his initial detention was valid, the length of, and rationale for, his lengthy detention before the Commonwealth contends probable cause was established cannot withstand scrutiny under the appellate precedents. In response, the Commonwealth asserts the following arguments: (1) that the length of the detention is not in itself determinative; (2) the period of detention was not unreasonable in light of the necessity for police to investigate a serious accident; (3) the detention must be upheld because Officer Burke was acting in good faith pursuant to a police department policy; and (4) other appellate court decisions have upheld detentions of similar duration based solely on reasonable suspicion. Although this court agrees that the length of a detention alone may not be determinative, the reason for the prolonged detention in this case cannot be justified under the Fourth Amendment jurisprudence of either the United States Supreme Court or the Virginia Court of Appeals.

---

[5] *Commonwealth v. Holloway*, 9 Va. App. 11, 15, 384 S.E.2d 99 (1989).

After Officer Burke directed the Defendant to stay next to his cruiser, police activity at the scene initially continued. Very shortly thereafter, however, a determination was made that the driver of the vehicle in the intersection had suffered life-threatening injuries. According to both Sergeant Cox and Officer Burke, they then totally ceased their investigation pursuant to a Fairfax County Police Department regulation that required them to contact and then await the arrival of a member of the Accident Reconstruction Unit. The Commonwealth does not argue that probable cause to arrest Morgan had then been established.

According to the evidence, Investigator Bean did not arrive until somewhere between approximately 35 and 48 minutes later. During that prolonged period of inactivity, there were numerous police officers on the scene — possibly six to eight officers according to Sergeant Cox. The intersection had been secured, and there is no evidence that either Officer Burke or Sergeant Cox took any other investigative action while everyone merely waited for Investigator Bean. Officer Burke was an experienced patrol officer who was fully able to conduct field sobriety testing of an individual suspected of driving under the influence and to question that suspect about how much alcohol he had ingested that evening. Nonetheless, Officer Burke took no action to "confirm or dispel [his] suspicion *quickly* and with *minimal intrusion* upon the person detained." *Washington v. Commonwealth*, 29 Va. App. at 15 (emphasis supplied).

"Police procedures [during a *Terry* stop] can . . . be so intrusive as to trigger the full protection of the Fourth and Fourteenth Amendments." *DePriest v. Commonwealth*, 4 Va. App. 577, 586, 359 S.E.2d 540 (quoting *Hayes v. Florida*, 470 U.S. 811, 815-16, 84 L. Ed. 2d 705, 105 S. Ct. 1643 (1985)). "While the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period to time, the scope of the intrusion permitted will vary [with each case]." *Thomas v. Commonwealth*, 16 Va. App. 851, 856-57, 434 S.E.2d 319 (1993) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983)) (punctuation omitted). During the entire period that the police awaited Bean's arrival, Morgan was ordered to stand near a number of police cruisers, with their emergency equipment activated, in the company of numerous police officers, while members of the general public drove by the scene. It cannot be seriously questioned that the prolonged period of detention herein was more than "minimally intrusive" to Morgan's privacy interests. See *Washington*, 29 Va. at 15; see also *Royer*, 460 U.S. at 500.

Burke testified that he delayed investigating his suspicions by questioning Morgan about alcohol consumption, conducting field coordination tests, and

administering an alkasensor, not because of any inability on his part to pursue such readily available means of investigation, but rather because a *policy* required him to wait for Bean. Having Investigator Bean present to photograph and interpret the physical evidence at the scene potentially could have aided in the overall investigation of the incident, but his presence was not necessary for "the police [to] diligently [pursue] a means of investigation that was likely to confirm or dispel their suspicions *quickly*, during which time it was *necessary* to detain the Defendant." *Ford v. Commonwealth*, 28 Va. App. 249, 258, 503 S.E.2d 803 (1998) (emphasis supplied). The course of events following Investigator Bean's arrival at the scene fully establishes this fact. Burke himself conducted the field-coordination tests at Bean's request, and then, according to Bean, placed Morgan under arrest at their conclusion. Other than asking Morgan whether he was driving, where he was coming from, and whether he had had anything to drink,[6] no evidence at the suppression hearing established any other steps taken by Investigator Bean to aid Officer Burke in verifying or dispelling his suspicions that probable cause existed to arrest Morgan for a criminal offense. It was only after Burke's suspicion was verified,[7] and Burke took Morgan from the scene, that Bean undertook any of his specialized accident reconstruction activities.

The Court further rejects the Commonwealth's argument that Morgan was detained for a reasonable period of time in light of the need for the police to investigate this serious accident. The right of the people to personal security free from government interference, guaranteed by the Fourth Amendment, cannot be abridged absent satisfactory proof that an exception to the Fourth Amendment's warrant requirement exists. See *South Dakota v. Opperman*, 428 U.S. 364, 382 and n. 10, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976); see also *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); cf. *Brinegar v. United States*, 338 U.S. 160, 174-77, 93 L. Ed. 1879, 69 S. Ct. 1302 (1949); *McDonald v. United States*, 335 U.S. 451, 454-56, 93 L. Ed. 153, 69 S. Ct. 191 (1948).

*Terry* and its progeny have created such an exception, but nowhere in the jurisprudence establishing that exception is there precedent that the rights guaranteed by the Fourth Amendment are subordinated to the needs of the police to investigate serious accidents. Once a warrantless seizure of a person

---

[6] All of these questions were either asked or could easily have been asked by Burke and/or Cox before Bean was summoned to the scene.

[7] In light of the Court's decision on the unlawful detention issue, the court need not address Morgan's additional argument that probable cause did not exist when Officer Burke placed him under arrest.

is effected, the Commonwealth bears the burden of establishing the validity for the seizure. See *Florida v. Royer*, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983); see also *Minnesota v. Dickerson*, 508 U.S. 366, 124 L. Ed. 2d 334, 113 S. Ct. 2130 (1993); *Arizona v. Hicks*, 480 U.S. 321, 94 L. Ed. 2d 347, 107 S. Ct. 1149 (1987). In order to meet that burden here, the Commonwealth must satisfy the test set out by the Court of Appeals in Washington. The Commonwealth cannot avoid the responsibility to carry its constitutional burden of proof by relying on the important, but not constitutionally sufficient, duties of the police to investigate the non-criminal causes of automobile accidents. Absent diligent efforts to pursue "a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the Defendant," a continuing seizure of an individual on less than probable cause to believe that he has committed an offense is unconstitutional. In addition, the Commonwealth's argument ignores the legally impermissible hiatus in the investigation during the wait for Investigator Bean. *Ford*, 28 Va. App. at 257; see also *Sharpe*, 470 U.S. at 685-86.

Nor can the detention herein be upheld based upon Officer Burke's good-faith compliance with a Fairfax County Police Department policy. As the United States Supreme Court, itself, held in *Terry v. Ohio*, " 'good faith on the part of the arresting officer is not enough.' . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects, only in the discretion of the police'." 392 U.S. at 22 (quoting *Beck v. Ohio*, 379 U.S. 89, 97, 13 L. Ed. 2d 142, 85 S. Ct. 223 (1964)). Moreover, all governmental enactments are subject to Fourth Amendment scrutiny and must comply with all constitutional requirements. See *Tennessee v. Garner*, 471 U.S. 1, 85 L. Ed. 2d 1, 105 S. Ct. 1694 (1985) (striking down the Tennessee statute authorizing the use of deadly force against unarmed subject as violative of the Fourth Amendment); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 325, 56 L. Ed. 2d 305, 98 S. Ct. 1816 (1978) (overturning Occupational Safety and Health Act of 1970, "in so far as it purports to authorize inspections without warrant or its equivalent."); *Sibron v. New York*, 392 U.S. 40, 61, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968) (holding that although a state may be free to develop its own laws of search and seizure to meet law enforcement needs, such laws may not "authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct"); *Ker v. California*, 374 U.S. 23, 34, 10 L. Ed. 2d 726, 83 S. Ct. 1623 (1963) (authorizing states to develop workable rules concerning arrest, search and seizure to meet law enforcement objectives "provided that those rules do not violate the constitutional proscription of unreasonable searches

and seizures and the concomitant command that evidence so seized is inadmissible against one who has standing to complain"); *NORML v. Mullen*, 608 F. Supp. 945 (D.C. Cal. 1985) (ruling agency policy unconstitutional as violative of Fourth Amendment).

As the Fairfax County Police Department regulation in question required Officer Burke to detain Morgan without probable cause to arrest, until a member of the ARU Team arrived, the regulation is unconstitutional as applied herein. Officer Burke's adherence to that unconstitutional policy cannot therefore serve as a permissible justification for the Fourth Amendment violation.

Finally, the Court is not persuaded by the Commonwealth's reliance on other appellate cases where detentions lasting longer than a few minutes were upheld. In each of those cases it was necessary rather then merely preferable, for ongoing investigation in order to "verify or dispel the suspicion." Many of those cases involved the need to bring drug sniffing dogs to the scene of a seizure, where no other constitutionally permissible means of verifying the suspicion were reasonably available. See, e.g., *Limonja v. Commonwealth*, 8 Va. App. 532, 541-43, 383 S.E.2d 476 (1989) (citations omitted); *United States v. Alpert*, 816 F.2d 958 (4th Cir. 1987). But see *United States v. Place*, 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983) (holding ninety minute detention of luggage awaiting arrival of trained narcotics dog unconstitutional). The twenty-minute detention of the pick-up driver by the Highway Patrol officer in *United States v. Sharpe* was necessitated by the DEA agent's need to turn over custody of the Pontiac driver to the local authorities and to proceed to the scene where the pick-up truck had been stopped. It was the DEA agent whose suspicions needed verification and whose experience and prior observations of the pick-up would enable him to verify or dispel those suspicions. In *Thomas v. Commonwealth*, 16 Va. App. at 856-57, aff'd 18 Va. App. 454 (1994), it was necessary to transport the suspect one block to the victim's house for possible identification; and in *Burgess v. Commonwealth*, 14 Va. App. 1018, 1022, 421 S.E.2d 664 (1992), the police were required to conduct a prolonged inquiry to determine whether the subject car was in fact stolen because of a computer failure.

In each of the above cases, the police diligently pursued the investigation necessary to verify or dispel the suspicion of criminal activity quickly. See *Sharpe*, 470 U.S. at 686. Here, to the contrary, the police ceased their investigation for an extended period of time while the Defendant remained detained, solely to await the arrival of an investigator whose presence was not necessary to verify or dispel the basis for the continuing detention of the Defendant. If the continued detention of Morgan to wait for the arrival of Investigator Bean under the circumstances of this case were to be deemed

valid, then all suspects detained on less than probable cause could be detained for prolonged periods by patrol officers waiting for the arrival of case-specific lead detectives or other specially trained police personnel. Such a ruling is neither warranted by the exigencies faced by law enforcement personnel nor any judicial precedents. If such an analysis were embraced by the judiciary, then the *Terry* exception "would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Dunaway v. New York*, 442 U.S. at 212-13.

Justice Brennan, in his dissent in *Sharpe*, was omniscient in predicting that arguments such as the ones advanced by the Commonwealth herein would necessarily flow from the Supreme Court's extension of its decision in *Terry v. Ohio*. Justice Brennan wrote:

> In this connection, I am particularly disturbed by the Court's suggestion that it might be constitutionally reasonable for a highway patrolman to hold a motorist on *Terry* suspicion pending the arrival of an officer with more "training and experience." The Court is of course correct in emphasizing that Cooke was much more expert at drug detection than Thrasher. I can imagine a great many roadside stop situations in which it might make good police sense for the detaining officer to hold the motorist indefinitely without probable cause so that the officer could have an expert interrogator drive out from the city to conduct the "brief" questioning authorized by *Terry*, or so that his more experienced sergeant could be summoned to render a second opinion, or so that a trained narcotics dog owned by the adjacent county could be driven out to sniff round the windows. I can also imagine circumstances where, given the limited number of patrol cars in a community, an officer might prefer to handcuff a person stopped for investigative questioning to a lamppost while the officer responded to an emergency call. All of these actions might be preferable from a law enforcement standpoint. The Framers did not enact the Fourth Amendment to further the investigative powers of the authorities, however, but to curtail them.

470 U.S at 719 (Brennan, J., dissenting). The prolonged detention of Morgan without probable cause cannot be justified on any alleged need to have a member of the Accident Reconstruction Unit respond to the accident scene.

### III. *Conclusion*

This court is not unmindful of the tragic consequences of this accident. However, decisions regarding the constitutionality of actions by law enforcement officers should not be rendered *post hoc*, based upon the effects of the alleged criminal activity. As the United States Supreme Court articulated almost thirty years ago, the "needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." *Almeida-Sanchez v. United States*, 413 U.S. 266, 273, 37 L. Ed. 2d 596, 93 S. Ct. 2535 (1973). Absent judicial adherence to the precedents interpreting the Fourth Amendment, "the constitutional guarantee against unreasonable searches and seizures would be a mere 'form of words'." *Terry*, 392 U.S. at 12 (quoting *Mapp v. Ohio*, 367 U.S. 643, 655, 6 L. Ed. 2d 1081, 81 S. Ct. 1684 (1961)).

For the reasons set out in this opinion, Morgan's Motion to Suppress is granted and all evidence arising from police activities after Sergeant Cox's call for an ARU member to respond to the accident scene is suppressed.