# CIRCUIT COURT OF FAIRFAX COUNTY

Commonwealth of Virginia

v.

Derek Marshall

December 14, 2009

Case No. FE-2009-823

BY JUDGE ROBERT J. SMITH

This matter comes before the Court on Defendant Derek Marshall's motion to suppress the evidence and the subsequent statements taken from him by Fairfax County Police Detective Ricky Savage. After considering the oral arguments of counsel and reviewing the applicable legal authority, the Court finds that Marshall was not subject to an unconstitutional seizure and, therefore, the motion to suppress should be denied.

*Background*

On Tuesday, March 17, 2009, sometime around 12:15 to 12:30 a.m., Ricky Savage, a Fairfax County police detective, was searching for a parking spot in a familiar neighborhood. He had just completed an off-duty

assignment. Detective Savage was driving an unmarked police cruiser. Detective Savage was wearing his blue uniform pants and a white T-shirt. As Detective Savage passed the Sequoia Farms townhouse complex, he noticed three individuals, one of whom was the defendant, to his left. The individuals were standing in a driveway of one of the townhouses, hovering over a parked Honda Accord.

Detective Savage turned off the main road as he drove past the individuals. At this point, the individuals noticed Detective Savage and began looking in his direction. Detective Savage testified that the situation gave him a "gut feeling" that something was not right. In particular, Detective Savage stated that based on his experience, the individuals' nervous demeanor, the manner in which they were observing him, and the time and place of the encounter, signaled to him that something improper might be happening. Detective Savage testified, "I guess my gut feeling was that, as a police officer, you know, just something was not right about that picture. I could not put my finger on it, but I was thinking there is just something strange here and, again, just from my experience as a police officer, something was not right."

Unable to find a parking space, Detective Savage made a u-turn to back out and go in a different direction to where he knew there were additional parking spaces. As he was making a left turn, he noticed the same three individuals again, walking down the street. The individuals noticed Detective Savage and continued walking at the same pace, but continued to look at him over their shoulders. The individuals were dressed in jackets and hooded sweatshirts with the hoods over their heads. Each individual was wearing a white or brown glove on only one hand. The fact that each individual wore but one glove concerned Detective Savage. Detective Savage knew from his experience in auto theft that individuals breaking into cars frequently wear only one glove to conceal their fingerprints.

Detective Savage stopped and exited his vehicle, but remained standing by the driver's door. He shined the spotlight on the left side of the cruiser at the individuals and activated the blue emergency lights. Detective Savage announced to the individuals that he was a police officer and that he wanted to ask them questions. Detective Savage testified, "I shined the light in their direction. I told them that I was a police officer, and I just wanted to ask questions as to if they knew where they were going and things of that nature." Detective Savage asked the individuals to come over to his car, whether they were lost and needed help, and if they had any weapons. Detective Savage had his gun drawn at this point, but he had it alongside his leg and out of the individuals' view. Detective Savage testified that he had withdrawn his gun for his own safety.

In response to Detective Savage's questions, the individuals answered that they were in the neighborhood to see a friend. However, when Detective Savage questioned them further, they were unable to state either the friend's name or where the friend lived. After hearing these responses, Detective Savage requested backup assistance. Detective Savage asked the three individuals if they could stay, asked them if he could see their hands, and directed them to place their hands on the hood of his cruiser.

Shortly thereafter, Officer Gary Paloi arrived at the scene. Officer Paloi told Detective Savage that there had been information about three black males breaking into cars near the townhouses on Winterfield Drive, about half a mile from Detective Savage's location. Detective Savage continued to talk to the individuals until additional backup arrived. At this point, Detective Savage had placed his weapon inside his waistband.

Shortly after Officer Paloi arrived, police radio traffic indicated that a vehicle matching the description of a vehicle stolen in Prince William County was nearby. The officers found a green Ford Explorer SUV on Sequoia Farms Drive, about a block from the scene. A license check of the vehicle revealed that it had been reported stolen in Prince William County. Officer Paloi inventoried the SUV. Officer Paloi found a driver's license inside a jacket pocket and a Valentine's Day card. The driver's license belonged to Marshall. The card was addressed to Marshall.

After these items had been retrieved and about thirty-five to forty minutes later, Detective Savage informed the three individuals that they were being detained and gave them *Miranda* warnings. At this point, Detective Savage asked the individuals where they were from and what they were doing. The three individuals were patted down and taken to the Sully Police Station in separate cruisers. Once in the cruisers, the three individuals were handcuffed. At the police station, Detective Savage interviewed Marshall.

On November 6, 2009, this Court heard Marshall's motion to suppress the evidence discovered in the Ford Explorer and the statements Marshall made to Detective Savage during their encounter on March 17, 2009.

*Analysis*

A. *Seizure*

The Fourth Amendment to the United States Constitution states that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const, amend. IV. However, not all encounters with the police constitute unreasonable searches, even if such encounters are not supported by probable

cause. For example, during non-custodial *Terry* stops, police are authorized to use means of detention that are reasonable under the circumstances. *Thomas v. Commonwealth*, 16 Va. App. 851, 857 (1993), aff'd *en banc*, 18 Va. App. 454 (1994).

Generally, *Terry* stops are investigatory and may be accompanied by protective searches, also known as "frisks" or "pat downs." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). The detention during a *Terry* stop may not last longer than necessary to either confirm or dispel the officer's suspicion. *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995). The Supreme Court of the United States specifically addressed the length of a *Terry* stop in *United States v. Sharpe*, stating that, "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the Defendant." 470 U.S. 675, 686 (1985). In Virginia, courts have upheld *Terry* stops of different durations. *See, e.g., Miller v. Commonwealth*, 16 Va. App. 1977, 980-81 (1993) (one hour); *Harris v. Commonwealth*, 27 Va. App. 554, 560 (1998) (approximately twenty minutes); *Commonwealth v. Morgan*, 58 Va. Cir. 579, 586 (Fairfax 2000) (twenty minutes).

Furthermore, *Terry* stops must rest on "reasonable suspicion," that is, "specific and articulable facts" that justify a detention. *Terry*, 392 U.S. at 21; *see also United States v. Cortez*, 499 U.S. 411, 417 (1981) (concluding that there must be "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. . . .)." Moreover, the determination of what is an "objective manifestation" is viewed from the standpoint of a law enforcement officer, not the general public. *Cortez*, 499 U.S. at 418.

In the present case, Detective Savage's detention of Marshall and the other two individuals was investigatory, not custodial. Detective Savage became suspicious of Marshall's conduct when he saw Marshall hovering over a car in a residential neighborhood at 12:15 or 12:30 a.m. Given Detective Savage's experience in the field of auto theft, it was reasonable for him to suspect that criminal activity was about to take place. Furthermore, the fact that Marshall was wearing a glove on one hand, a common occurrence in auto theft crimes in the mind of Detective Savage, supported Detective Savage's reasonable suspicion. Thus, because Detective Savage's suspicions and actions were supported by "specific and articulable facts," he could justifiably detain Marshall. After the police searched the Ford SUV and found Marshall's belongings inside, the police had probable cause to arrest Marshall and the other two individuals.

The mere fact that Detective Savage had his gun drawn does not indicate that Marshall had been placed under arrest. *Terry* and its progeny have consistently held that police officers are justified to display their weapons during investigative stops in order to insure their own safety. *Terry*, 392 U.S.; *Harris*, 27 Va. App. 554. Since Detective Savage did not feel safe with Marshall and the other two men until the backup arrived, his holding his gun behind his leg did not turn the stop into an arrest. Moreover, there is no evidence that any of the three individuals saw Detective Savage's weapon.

Nor does it appear that Detective Savage detained Marshall for longer than was necessary to confirm or dispel his suspicions. Detective Savage held Marshall only until the backup arrived and the connection between Marshall and crimes reported by Officer Paloi had been confirmed. Under these circumstances, the thirty-five to forty minute detention was not unreasonable.

For the reasons stated above, Marshall's motion to suppress the evidence recovered from the Ford SUV is denied.

## B. *Custodial Interrogation*

In general, whenever a person is in custody, *Miranda* warnings are necessary before an interrogation can take place. *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). However, not every detention constitutes a custodial interrogation within the meaning of *Miranda*. *Cherry v. Commonwealth*, 14 Va. App. 135, 140 (1992); *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("police officers are not required to administer *Miranda* warnings to everyone whom they question.").

A suspect is considered to be "in custody" if he or she has been arrested or if his or her freedom has been restrained in a manner analogous to an arrest. *United States v. Sullivan*, 138 F.3d 126, 130 (4th Cir. 1998). Alternatively, a person is considered to be in custody if he or she does not reasonably believe to have the liberty to terminate the encounter. *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

The test that should be applied in determining whether a custodial situation exists is "the totality of the circumstances," and no single factor is dispositive. The elements of this test that Virginia courts have used are: (1) the manner in which the individual is approached by the police; (2) the nature of the surroundings; (3) the number of police officers; (4) the level of physical restraint; (5) the duration and character of questioning; and (6) the extent to which the officer's beliefs in the individual's culpability were made known to that individual. *Durand v. Commonwealth*, 2009 Va. App. LEXIS 419 (Sept. 22, 2009).

It should be noted that determining whether a particular detention is a custodial interrogation turns on the objective circumstances and not the subjective interpretations of either the subject or the police. *Stansbury v. California*, 511 U.S. 318, 323 (1994). In addition, the Supreme Court of the United States clearly held that the police are authorized to temporarily stop a person whom they suspect to be engaged in criminal activity even if such a stop is forcible and lacks probable cause. *United States v. Sokolow*, 490 U.S. 1 (1989), *citing Terry*, 392 U.S.; *United States v. Place*, 462 U.S. 696 (1982).

Furthermore, mere encounters with the police, as long as they do not involve obvious restraint, do not rise to the level of a "custodial interrogation" and, therefore, do not constitute unlawful seizures for the purposes of the Fourth Amendment. *Sullivan*, 138 F.3d at 131. In Virginia, courts have interpreted numerous scenarios in deciding unlawful seizure issues. For example, in *Sullivan*, the Fourth Circuit held that repeating several times that it is better to "tell me now" did not amount to an unlawful seizure given that the stop occurred during the day and in public view. *Id.* at 132.

Additionally, a review of Virginia decisions indicates that non-custodial stops upheld by the courts have involved a wide range of duration of time. *See, e.g., Commonwealth v. Meyers*, 2005 Va. App. LEXIS 57, *11 (Feb. 8, 2005) (fifteen to thirty minutes); *Aldridge v. Commonwealth*, 44 Va. App. 618, 645 (2004) (thirty minutes); *Lee v. Commonwealth*, 2004 Va. App. LEXIS 500, *10 (Oct. 26, 2004) (three hours); *Harris*, 27 Va. App. at 560 (twenty minutes); *Ramos v. Commonwealth*, 30 Va. App. 365 (1999) (twenty-one minutes).

Moreover, a display of force by the police, such as drawing of weapons, placing the suspect in the police car, using or threatening force do not necessarily turn a lawful stop into a custodial arrest. *Young v. Prince George's County*, 355 F.3d 751, 755 (4th Cir. 2004) (finding that handcuffing of suspect did not amount to arrest where suspect was armed); *Leshuk*, 65 F.3d at 1110; *United States v. Perate*, 719 F.2d 706, 709 (4th Cir. 1983) (concluding that blockading suspect's car and drawing weapons did not constitute an arrest where police feared for their safety); *Scott v. Commonwealth*, 2009 Va. App, LEXIS 251, *8-9 (June 2, 2009) (finding handcuffing acceptable where officer needed to confirm whether suspect's cigar contained marijuana); *Harris*, 27 Va. App. at 562 (holding that drawing a gun when suspect refused to comply with police orders did not constitute an arrest). *But see Florida v. Royer*, 460 U.S. 491, 496 (1983) (finding custodial interrogation where the police confined the defendant in a small room, took away his bus ticket, and continuously told him that he was a suspect); *Wass v. Commonwealth*, 5 Va.

App. 27, 34 (1987) (stating that the presence of twelve police officers and a helicopter, threatening to kill the suspect's dog, or barricading the suspect's house amounted to "custodial interrogation").

Applying the totality of the circumstances standard and the *Durand* factors to this case, I find that the encounter between Detective Savage and Marshall did not amount to a custodial interrogation. First, Detective Savage did not approach Marshall in a threatening manner, but rather amicably offered his assistance. Second, the encounter in question took place in a residential neighborhood at 12:15 or 12:30 a.m., with nobody on the streets except Detective Savage and the three individuals. Third, Detective Savage was the only officer present during the initial detention. Fourth, the degree of restraint imposed by Detective Savage was minimal and consisted only of asking Marshall to stay, show his hands, and place them on the hood of the cruiser. Fifth, the duration of the detention, namely thirty-five to forty minutes, is within the time limits deemed acceptable by Virginia decisions. Furthermore, the nature of Detective Savage's questioning was not forceful or threatening, even given the fact that he had his gun out and alongside his leg. As Detective Savage testified, the gun was drawn for his safety and was concealed at all times before the backup arrived. Lastly, Detective Savage did not explicitly state his belief in their culpability.

For the reasons stated above, Marshall's motion to suppress the statements he made to Detective Savage is denied.